# IN RE YAMASHITA.

**NO. 61, MISC.**

Argued January 7, 8, 1946.—Decided February 4, 1946.

2

4

*Colonel Harry E. Clarke, pro hac vice, Captain A. Frank Reel* and *Captain Milton Sandberg* argued the cause for petitioner.   With them on the brief were *Lt. Col. Walter C. Hendrix, Lt. Col. James G. Feldhaus* and *Major George F. Guy.*

*Solicitor General McGrath* and *Assistant Solicitor General Judson* argued the cause for respondent.   With them on the brief were *The Judge Advocate General of the Army, Frederick Bernays Wiener, George Thomas Washington, David Reich, Irving Hill, Colonel William J. Hughes, Jr.* and *Captain D. C. Hill.*

MR. CHIEF JUSTICE STONE delivered the opinion of the Court.

No. 61 Miscellaneous is an application for leave to file a petition for writs of habeas corpus and prohibition in this Court.   No. 672 is a petition for certiorari to review an order of the Supreme Court of the Commonwealth of the Philippines (28 U. S. C. § 349), denying petitioner's application to that court for writs of habeas corpus and prohibition.   As both applications raise substantially like questions, and because of the importance and novelty of some of those presented, we set the two applications down for oral argument as one case.

From the petitions and supporting papers it appears that prior to September 3, 1945, petitioner was the Commanding General of the Fourteenth Army Group of the Imperial Japanese Army in the Philippine Islands. On that date he surrendered to and became a prisoner of war of the United States Army Forces in Baguio, Philippine Islands. On September 25th, by order of respondent, Lieutenant General Wilhelm D. Styer, Commanding General of the United States Army Forces, Western Pacific, which command embraces the Philippine Islands, petitioner was served with a charge prepared by the Judge Advocate General's Department of the Army, purporting to charge petitioner with a violation of the law of war. On October 8, 1945, petitioner, after pleading not guilty to the charge, was held for trial before a military commission of five Army officers appointed by order of General Styer. The order appointed six Army officers, all lawyers, as defense counsel. Throughout the proceedings which followed, including those before this Court, defense counsel have demonstrated their professional skill and resourcefulness and their proper zeal for the defense with which they were charged.

On the same date a bill of particulars was filed by the prosecution, and the commission heard a motion made in petitioner's behalf to dismiss the charge on the ground that it failed to state a violation of the law of war. On October 29th the commission was reconvened, a supplemental bill of particulars was filed, and the motion to dismiss was denied. The trial then proceeded until its conclusion on December 7, 1945, the commission hearing two hundred and eighty-six witnesses, who gave over three thousand pages of testimony. On that date petitioner was found guilty of the offense as charged and sentenced to death by hanging.

The petitions for habeas corpus set up that the detention of petitioner for the purpose of the trial was unlawful for

reasons which are now urged as showing that the military commission was without lawful authority or jurisdiction to place petitioner on trial, as follows:

(a) That the military commission which tried and convicted petitioner was not lawfully created, and that no military commission to try petitioner for violations of the law of war could lawfully be convened after the cessation of hostilities between the armed forces of the United States and Japan;

(b) That the charge preferred against petitioner fails to charge him with a violation of the law of war;

(c) That the commission was without authority and jurisdiction to try and convict petitioner because the order governing the procedure of the commission permitted the admission in evidence of depositions, affidavits and hearsay and opinion evidence, and because the commission's rulings admitting such evidence were in violation of the 25th and 38th Articles of War (10 U. S. C. §§ 1496, 1509) and the Geneva Convention (47 Stat. 2021), and deprived petitioner of a fair trial in violation of the due process clause of the Fifth Amendment;

(d) That the commission was without authority and jurisdiction in the premises because of the failure to give advance notice of petitioner's trial to the neutral power representing the interests of Japan as a belligerent as required by Article 60 of the Geneva Convention, 47 Stat. 2021, 2051.

On the same grounds the petitions for writs of prohibition set up that the commission is without authority to proceed with the trial.

The Supreme Court of the Philippine Islands, after hearing argument, denied the petition for habeas corpus presented to it, on the ground, among others, that its jurisdiction was limited to an inquiry as to the jurisdiction of the commission to place petitioner on trial for the offense charged, and that the commission, being validly consti-

tuted by the order of General Styer, had jurisdiction over the person of petitioner and over the trial for the offense charged.

In *Ex parte Quirin,* 317 U. S. 1, we had occasion to consider at length the sources and nature of the authority to create military commissions for the trial of enemy combatants for offenses against the law of war. We there pointed out that Congress, in the exercise of the power conferred upon it by Article I, § 8, Cl. 10 of the Constitution to "define and punish . . . Offences against the Law of Nations . . .," of which the law of war is a part, had by the Articles of War (10 U. S. C. §§ 1471–1593) recognized the "military commission" appointed by military command, as it had previously existed in United States Army practice, as an appropriate tribunal for the trial and punishment of offenses against the law of war. Article 15 declares that the "provisions of these articles conferring jurisdiction upon courts martial shall not be construed as depriving military commissions . . . or other military tribunals of concurrent jurisdiction in respect of offenders or offenses that by statute or by the law of war may be triable by such military commissions . . . or other military tribunals." See a similar provision of the Espionage Act of 1917, 50 U. S. C. § 38. Article 2 includes among those persons subject to the Articles of War the personnel of our own military establishment. But this, as Article 12 indicates, does not exclude from the class of persons subject to trial by military commissions "any other person who by the law of war is subject to trial by military tribunals," and who, under Article 12, may be tried by court-martial, or under Article 15 by military commission.

We further pointed out that Congress, by sanctioning trial of enemy combatants for violations of the law of war by military commission, had not attempted to codify the law of war or to mark its precise boundaries. Instead, by Article 15 it had incorporated, by reference, as within the

preexisting jurisdiction of military commissions created by appropriate military command, all offenses which are defined as such by the law of war, and which may constitutionally be included within that jurisdiction. It thus adopted the system of military common law applied by military tribunals so far as it should be recognized and deemed applicable by the courts, and as further defined and supplemented by the Hague Convention, to which the United States and the Axis powers were parties.

We also emphasized in *Ex parte Quirin*, as we do here, that on application for habeas corpus we are not concerned with the guilt or innocence of the petitioners. We consider here only the lawful power of the commission to try the petitioner for the offense charged. In the present cases it must be recognized throughout that the military tribunals which Congress has sanctioned by the Articles of War are not courts whose rulings and judgments are made subject to review by this Court. See *Ex parte Vallandigham*, 1 Wall. 243; *In re Vidal*, 179 U. S. 126; cf. *Ex parte Quirin, supra,* 39. They are tribunals whose determinations are reviewable by the military authorities either as provided in the military orders constituting such tribunals or as provided by the Articles of War. Congress conferred on the courts no power to review their determinations save only as it has granted judicial power "to grant writs of habeas corpus for the purpose of an inquiry into the cause of restraint of liberty." 28 U. S. C. §§ 451, 452. The courts may inquire whether the detention complained of is within the authority of those detaining the petitioner. If the military tribunals have lawful authority to hear, decide and condemn, their action is not subject to judicial review merely because they have made a wrong decision on disputed facts. Correction of their errors of decision is not for the courts but for the military authorities which are alone authorized to review their decisions. See *Dynes* v. *Hoover,* 20 How. 65, 81; *Runkle* v. *United States,* 122

U. S. 543, 555–556; *Carter* v. *McClaughry*, 183 U. S. 365; *Collins* v. *McDonald*, 258 U. S. 416. Cf. *Matter of Moran*, 203 U. S. 96, 105.

Finally, we held in *Ex parte Quirin, supra*, 24, 25, as we hold now, that Congress by sanctioning trials of enemy aliens by military commission for offenses against the law of war had recognized the right of the accused to make a defense. Cf. *Ex parte Kawato*, 317 U. S. 69. It has not foreclosed their right to contend that the Constitution or laws of the United States withhold authority to proceed with the trial. It has not withdrawn, and the Executive branch of the Government could not, unless there was suspension of the writ, withdraw from the courts the duty and power to make such inquiry into the authority of the commission as may be made by habeas corpus.

With these governing principles in mind we turn to the consideration of the several contentions urged to establish want of authority in the commission. We are not here concerned with the power of military commissions to try civilians. See *Ex parte Milligan*, 4 Wall. 2, 132; *Sterling* v. *Constantin*, 287 U. S. 378; *Ex parte Quirin, supra*, 45. The Government's contention is that General Styer's order creating the commission conferred authority on it only to try the purported charge of violation of the law of war committed by petitioner, an enemy belligerent, while in command of a hostile army occupying United States territory during time of war. Our first inquiry must therefore be whether the present commission was created by lawful military command and, if so, whether authority could thus be conferred on the commission to place petitioner on trial after the cessation of hostilities between the armed forces of the United States and Japan.

*The authority to create the commission.* General Styer's order for the appointment of the commission was made by him as Commander of the United States Army Forces, Western Pacific. His command includes, as part

of a vastly greater area, the Philippine Islands, wher∗ the alleged offenses were committed, where petitioner surrendered as a prisoner of war, and where, at the time of the order convening the commission, he was detained as a pris oner in custody of the United States Army. The congressional recognition of military commissions and its sanction of their use in trying offenses against the law of war to which we have referred, sanctioned their creation by military command in conformity to long-established American precedents. Such a commission may be appointed by any field commander, or by any commander competent to appoint a general court-martial, as was General Styer, who had been vested with that power by order of the President. 2 Winthrop, Military Law and Precedents, 2d ed., *1302; cf. Article of War 8. .

Here the commission was not only created by a commander competent to appoint it, but his order conformed to the established policy of the Government and to higher military commands authorizing his action. In a proclamation of July 2, 1942 (56 Stat. 1964), the President proclaimed that enemy belligerents who, during time of war, enter the United States, or any territory or possession thereof, and who violate the law of war, should be subject to the law of war and to the jurisdiction of military tribunals. Paragraph 10 of the Declaration of Potsdam of July 26, 1945, declared that ". . . stern justice shall be meted out to all war criminals, including those who have visited cruelties upon our prisoners." U. S. Dept. of State Bull., Vol. XIII, No. 318, pp. 137–138. This Declaration was accepted by the Japanese government by its note of August 10, 1945. U. S. Dept. of State Bull., Vol. XIII, No. 320, p. 205.

By direction of the President, the Joint Chiefs of Staff of the American Military Forces, on September 12, 1945, instructed General MacArthur, Commander in Chief, United States Army Forces, Pacific, to proceed with the trial, be-

fore appropriate military tribunals, of such Japanese war criminals "as have been or may be apprehended." By order of General MacArthur of September 24, 1945, General Styer was specifically directed to proceed with the trial of petitioner upon the charge here involved. This order was accompanied by detailed rules and regulations which General MacArthur prescribed for the trial of war criminals. These regulations directed, among other things, that review of the sentence imposed by the commission should be by the officer convening it, with "authority to approve, mitigate, remit, commute, suspend, reduce or otherwise alter the sentence imposed," and directed that no sentence of death should be carried into effect until confirmed by the Commander in Chief, United States Army Forces, Pacific.

It thus appears that the order creating the commission for the trial of petitioner was authorized by military command, and was in complete conformity to the Act of Congress sanctioning the creation of such tribunals for the trial of offenses against the law of war committed by enemy combatants. And we turn to the question whether the authority to create the commission and direct the trial by military order continued after the cessation of hostilities.

An important incident to the conduct of war is the adoption of measures by the military commander, not only to repel and defeat the enemy, but to seize and subject to disciplinary measures those enemies who, in their attempt to thwart or impede our military effort, have violated the law of war. *Ex parte Quirin, supra,* 28. The trial and punishment of enemy combatants who have committed violations of the law of war is thus not only a part of the conduct of war operating as a preventive measure against such violations, but is an exercise of the authority sanctioned by Congress to administer the system of military justice recognized by the law of war. That sanction is without qualification as to the exercise of this authority so

long as a state of war exists—from its declaration until peace is proclaimed. See *United States* v. *Anderson,* 9 Wall. 56, 70; *The Protector,* 12 Wall. 700, 702; *McElrath* v. *United States,* 102 U. S. 426, 438; *Kahn* v. *Anderson,* 255 U. S. 1, 9–10. The war power, from which the commission derives its existence, is not limited to victories in the field, but carries with it the inherent power to guard against the immediate renewal of the conflict, and to remedy, at least in ways Congress has recognized, the evils which the military operations have produced. See *Stewart* v. *Kahn,* 11 Wall. 493, 507.

We cannot say that there is no authority to convene a commission after hostilities have ended to try violations of the law of war committed before their cessation, at least until peace has been officially recognized by treaty or proclamation of the political branch of the Government. In fact, in most instances the practical administration of the system of military justice under the law of war would fail if such authority were thought to end with the cessation of hostilities. For only after their cessation could the greater number of offenders and the principal ones be apprehended and subjected to trial.

No writer on international law appears to have regarded the power of military tribunals, otherwise competent to try violations of the law of war, as terminating before the formal state of war has ended.[1]  In our own military his-

---

[1] The Commission on the Responsibility of the Authors of the War and on the Enforcement of Penalties of the Versailles Peace Conference, which met after cessation of hostilities in the First World War, were of the view that violators of the law of war could be tried by military tribunals. See Report of the Commission, March 9, 1919, 14 Am. J. Int. L. 95, 121. See also memorandum of American commissioners concurring on this point, *id.,* at p. 141. The treaties of peace concluded after World War I recognized the right of the Allies and of the United States to try such offenders before military tribunals. See Art. 228 of Treaty of Versailles, June 28, 1919; Art. 173 of Treaty of

tory there have been numerous instances in which offenders were tried by military commission after the cessation of hostilities and before the proclamation of peace, for offenses against the law of war committed before the cessation of hostilities.[2]

The extent to which the power to prosecute violations of the law of war shall be exercised before peace is declared rests, not with the courts, but with the political branch of the Government, and may itself be governed by the terms of an armistice or the treaty of peace. Here, peace has not been agreed upon or proclaimed. Japan, by her acceptance of the Potsdam Declaration and her surrender, has acquiesced in the trials of those guilty of violations of the law of war. The conduct of the trial by the military commission has been authorized by the political branch of the Government, by military command, by international law and usage, and by the terms of the surrender of the Japanese government.

*The charge.* Neither congressional action nor the military orders constituting the commission authorized it to place petitioner on trial unless the charge preferred against him is of a violation of the law of war. The charge, so far as now relevant, is that petitioner, between October 9, 1944 and September 2, 1945, in the Philippine Islands, "while commander of armed forces of Japan at war with the United States of America and its allies, unlawfully disregarded and failed to discharge his duty as commander to

St. Germain, Sept. 10, 1919; Art. 157 of Treaty of Trianon, June 4, 1920.

The terms of the agreement which ended hostilities in the Boer War reserved the right to try, before military tribunals, enemy combatants who had violated the law of war. 95 British and Foreign State Papers (1901–1902) 160. See also trials cited in Colby, War Crimes, 23 Michigan Law Rev. 482, 496–7.

[2] See cases mentioned in *Ex parte Quirin, supra,* p. 32, note 10, and in 2 Winthrop, *supra,* *1310–1311, n. 5; 14 Op. A. G. 249 (Modoc Indian Prisoners).

14

control the operations of the members of his command, permitting them to commit brutal atrocities and other high crimes against people of the United States and of its allies and dependencies, particularly the Philippines; and he . . . thereby violated the laws of war."

Bills of particulars, filed by the prosecution by order of the commission, allege a series of acts, one hundred and twenty-three in number, committed by members of the forces under petitioner's command during the period mentioned. The first item specifies the execution of "a deliberate plan and purpose to massacre and exterminate a large part of the civilian population of Batangas Province, and to devastate and destroy public, private and religious property therein, as a result of which more than 25,000 men, women and children, all unarmed noncombatant civilians, were brutally mistreated and killed, without cause or trial, and entire settlements were devastated and destroyed wantonly and without military necessity." Other items specify acts of violence, cruelty and homicide inflicted upon the civilian population and prisoners of war, acts of wholesale pillage and the wanton destruction of religious monuments.

It is not denied that such acts directed against the civilian population of an occupied country and against prisoners of war are recognized in international law as violations of the law of war. Articles 4, 28, 46, and 47, Annex to the Fourth Hague Convention, 1907, 36 Stat. 2277, 2296, 2303, 2306–7. But it is urged that the charge does not allege that petitioner has either committed or directed the commission of such acts, and consequently that no violation is charged as against him. But this overlooks the fact that the gist of the charge is an unlawful breach of duty by petitioner as an army commander to control the operations of the members of his command by "permitting them to commit" the extensive and widespread atrocities specified. The question then is whether the law of war imposes

on an army commander a duty to take such appropriate measures as are within his power to control the troops under his command for the prevention of the specified acts which are violations of the law of war and which are likely to attend the occupation of hostile territory by an uncontrolled soldiery, and whether he may be charged with personal responsibility for his failure to take such measures when violations result. That this was the precise issue to be tried was made clear by the statement of the prosecution at the opening of the trial.

It is evident that the conduct of military operations by troops whose excesses are unrestrained by the orders or efforts of their commander would almost certainly result in violations which it is the purpose of the law of war to prevent. Its purpose to protect civilian populations and prisoners of war from brutality would largely be defeated if the commander of an invading army could with impunity neglect to take reasonable measures for their protection. Hence the law of war presupposes that its violation is to be avoided through the control of the operations of war by commanders who are to some extent responsible for their subordinates.

This is recognized by the Annex to the Fourth Hague Convention of 1907, respecting the laws and customs of war on land. Article 1 lays down as a condition which an armed force must fulfill in order to be accorded the rights of lawful belligerents, that it must be "commanded by a person responsible for his subordinates." 36 Stat. 2295. Similarly Article 19 of the Tenth Hague Convention, relating to bombardment by naval vessels, provides that commanders in chief of the belligerent vessels "must see that the above Articles are properly carried out." 36 Stat. 2389. And Article 26 of the Geneva Red Cross Convention of 1929, 47 Stat. 2074, 2092, for the amelioration of the condition of the wounded and sick in armies in the field, makes it "the duty of the commanders-in-chief of the bel-

ligerent armies to provide for the details of execution of the foregoing articles, [of the convention] as well as for unforeseen cases . . ." And, finally, Article 43 of the Annex of the Fourth Hague Convention, 36 Stat. 2306, requires that the commander of a force occupying enemy territory, as was petitioner, "shall take all the measures in his power to restore, and ensure, as far as possible, public order and safety, while respecting, unless absolutely prevented, the laws in force in the country."

These provisions plainly imposed on petitioner, who at the time specified was military governor of the Philippines, as well as commander of the Japanese forces, an affirmative duty to take such measures as were within his power and appropriate in the circumstances to protect prisoners of war and the civilian population. This duty of a commanding officer has heretofore been recognized, and its breach penalized by our own military tribunals.[3] A like principle has been applied so as to impose liability on the United States in international arbitrations. *Case of Jeannaud,* 3 Moore, International Arbitrations, 3000; *Case of The Zafiro,* 5 Hackworth, Digest of International Law, 707.

We do not make the laws of war but we respect them so far as they do not conflict with the commands of Congress or the Constitution. There is no contention that the present charge, thus read, is without the support of evidence, or that the commission held petitioner responsible for failing to take measures which were beyond his control or inappropriate for a commanding officer to take in the circum-

---

[3] Failure of an officer to take measures to prevent murder of an inhabitant of an occupied country committed in his presence. Gen. Orders No. 221, Hq. Div. of the Philippines, August 17, 1901. And in Gen. Orders No. 264, Hq. Div. of the Philippines, September 9, 1901, it was held that an officer could not be found guilty for failure to prevent a murder unless it appeared that the accused had "the power to prevent" it.

stances.[4]   We do not here appraise the evidence on which petitioner was convicted.   We do not consider what measures, if any, petitioner took to prevent the commission, by the troops under his command, of the plain violations of the law of war detailed in the bill of particulars, or whether such measures as he may have taken were appropriate and sufficient to discharge the duty imposed upon him.   These are questions within the peculiar competence of the military officers composing the commission and were for it to decide.   See *Smith* v. *Whitney*, 116 U. S. 167, 178.   It is plain that the charge on which petitioner was tried charged him with a breach of his duty to control the operations of the members of his command, by permitting them to commit the specified atrocities.   This was enough to require the commission to hear evidence tending to establish the culpable failure of petitioner to perform the duty imposed on him by the law of war and to pass upon its sufficiency to establish guilt.

Obviously charges of violations of the law of war triable before a military tribunal need not be stated with the precision of a common law indictment.   Cf. *Collins* v. *McDonald, supra,* 420.   But we conclude that the allegations of the charge, tested by any reasonable standard, adequately allege a violation of the law of war and that the

---

[4] In its findings the commission took account of the difficulties "faced by the Accused with respect not only to the swift and overpowering advance of American forces, but also to the errors of his predecessors, weaknesses in organization, equipment, supply . . ., training, communication, discipline and morale of his troops," and the "tactical situation, the character, training and capacity of staff officers and subordinate commanders as well as the traits of character . . . of his troops." It nonetheless found that petitioner had not taken such measures to control his troops as were "required by the circumstances." We do not weigh the evidence.   We merely hold that the charge sufficiently states a violation against the law of war, and that the commission, upon the facts found, could properly find petitioner guilty of such a violation.

commission had authority to try and decide the issue which it raised. Cf. *Dealy* v. *United States*, 152 U. S. 539; *Williamson* v. *United States*, 207 U. S. 425, 447; *Glasser* v. *United States*, 315 U. S. 60, 66, and cases cited.

*The proceedings before the commission.* The regulations prescribed by General MacArthur governing the procedure for the trial of petitioner by the commission directed that the commission should admit such evidence "as in its opinion would be of assistance in proving or disproving the charge, or such as in the commission's opinion would have probative value in the mind of a reasonable man," and that in particular it might admit affidavits, depositions or other statements taken by officers detailed for that purpose by military authority. The petitions in this case charged that in the course of the trial the commission received, over objection by petitioner's counsel, the deposition of a witness taken pursuant to military authority by a United States Army captain. It also, over like objection, admitted hearsay and opinion evidence tendered by the prosecution. Petitioner argues, as ground for the writ of habeas corpus, that Article 25 [5] of the Articles of War prohibited the reception in evidence by the commission of depositions on behalf of the prosecution in a capital case, and that Article 38 [6] prohibited the reception of hearsay and of opinion evidence.

---

[5] Article 25 provides: "A duly authenticated deposition taken upon reasonable notice to the opposite party may be read in evidence before any military court or commission in any case not capital, or in any proceeding before a court of inquiry or a military board, . . . *Provided,* That testimony by deposition may be adduced for the defense in capital cases."

[6] Article 38 provides: "The President may, by regulations, which he may modify from time to time, prescribe the procedure, including modes of proof, in cases before courts-martial, courts of inquiry, military commissions, and other military tribunals, which regulations shall insofar as he shall deem practicable, apply the rules of evidence generally recognized in the trial of criminal cases in the district courts of the United States: *Provided,* That nothing contrary to or inconsistent with these articles shall be so prescribed: . . ."

We think that neither Article 25 nor Article 38 is applicable to the trial of an enemy combatant by a military commission for violations of the law of war. Article 2 of the Articles of War enumerates "the persons . . . subject to these articles," who are denominated, for purposes of the Articles, as "persons subject to military law." In general, the persons so enumerated are members of our own Army and of the personnel accompanying the Army. Enemy combatants are not included among them. Articles 12, 13 and 14, before the adoption of Article 15 in 1916, made all "persons subject to military law" amenable to trial by courts-martial for any offense made punishable by the Articles of War. Article 12 makes triable by general court-martial "any other person who by the law of war is subject to trial by military tribunals." Since Article 2, in its 1916 form, includes some persons who, by the law of war, were, prior to 1916, triable by military commission, it was feared by the proponents of the 1916 legislation that in the absence of a saving provision, the authority given by Articles 12, 13 and 14 to try such persons before courts-martial might be construed to deprive the non-statutory military commission of a portion of what was considered to be its traditional jurisdiction. To avoid this, and to preserve that jurisdiction intact, Article 15 was added to the Articles.[7] It declared that "The provisions of these articles

---

[7] General Crowder, the Judge Advocate General, who appeared before Congress as sponsor for the adoption of Article 15 and the accompanying amendment of. Article 25, in explaining the purpose of Article 15, said:

"Article 15 is new. We have included in article 2 as subject to military law a number of persons who are also subject to trial by military commission. A military commission is our common-law war court. It has no statutory existence, though it is recognized by statute law. As long as the articles embraced them in the designation 'persons subject to military law,' and provided that they might be tried by court-martial, I was afraid that, having made a special provision for their trial by court-martial, [Arts. 12, 13, and 14] it might be held that the provision operated to exclude trials by military commission and other war courts; so this new article was introduced: . . ." (Sen. R. 130, 64th Cong., 1st Sess., p. 40.)

conferring jurisdiction upon courts-martial shall not be construed as depriving military commissions . . . of concurrent jurisdiction in respect of offenders or offenses that . . . by the law of war may be triable by such military commissions."

By thus recognizing military commissions in order to preserve their traditional jurisdiction over enemy combatants unimpaired by the Articles, Congress gave sanction, as we held in *Ex parte Quirin,* to any use of the military commission contemplated by the common law of war. But it did not thereby make subject to the Articles of War persons other than those defined by Article 2 as being subject to the Articles, nor did it confer the benefits of the Articles upon such persons. The Articles recognized but one kind of military commission, not two. But they sanctioned the use of that one for the trial of two classes of persons, to one of which the Articles do, and to the other of which they do not, apply in such trials. Being of this latter class, petitioner cannot claim the benefits of the Articles, which are applicable only to the members of the other class. Petitioner, an enemy combatant, is therefore not a person made subject to the Articles of War by Article 2, and the military commission before which he was tried, though sanctioned, and its jurisdiction saved, by Article 15, was not convened by virtue of the Articles of War, but pursuant to the common law of war. It follows that the Articles of War, including Articles 25 and 38, were not applicable to petitioner's trial and imposed no restrictions upon the procedure to be followed. The Articles left the control over the procedure in such a case where it had previously been, with the military command.

Petitioner further urges that by virtue of Article 63 of the Geneva Convention of 1929, 47 Stat. 2052, he is entitled to the benefits afforded by the 25th and 38th Articles of War to members of our own forces. Article 63 provides: "Sentence may be pronounced against a prisoner of war

only by the same courts and according to the same procedure as in the case of persons belonging to the armed forces of the detaining Power." Since petitioner is a prisoner of war, and as the 25th and 38th Articles of War apply to the trial of any person in our own armed forces, it is said that Article 63 requires them to be applied in the trial of petitioner. But we think examination of Article 63 in its setting in the Convention plainly shows that it refers to sentence "pronounced against a prisoner of war" for an offense committed while a prisoner of war, and not for a violation of the law of war committed while a combatant.

Article 63 of the Convention appears in part 3, entitled "Judicial Suits," of Chapter 3, "Penalties Applicable to Prisoners of War," of § V, "Prisoners' Relations with the Authorities;" one of the sections of Title III, "Captivity." All taken together relate only to the conduct and control of prisoners of war while in captivity as such. Chapter 1 of § V, Article 42 deals with complaints of prisoners of war because of the conditions of captivity. Chapter 2, Articles 43 and 44, relates to those of their number chosen by prisoners of war to represent them.

Chapter 3 of § V, Articles 45 through 67, is entitled "Penalties Applicable to Prisoners of War." Part 1 of that chapter, Articles 45 through 53, indicate what acts of prisoners of war, committed while prisoners, shall be considered offenses, and defines to some extent the punishment which the detaining power may impose on account of such offenses.[8] Punishment is of two kinds—"disciplinary" and

---

[8] Part 1 of Chapter 3, "General Provisions," provides in Articles 45 and 46 that prisoners of war are subject to the regulations in force in the armies of the detaining power, that punishments other than those provided "for the same acts for soldiers of the national armies" may not be imposed on prisoners of war, and that "Collective punishment for individual acts" is forbidden. Article 47 provides that "Acts constituting an offense against discipline, and particularly attempted escape, shall be verified immediately; for all prisoners of war; commissioned

"judicial," the latter being the more severe. Article 52 requires that leniency be exercised in deciding whether an offense requires disciplinary or judicial punishment. Part 2 of Chapter 3 is entitled "Disciplinary Punishments," and further defines the extent of such punishment, and the mode in which it may be imposed. Part 3, entitled "Judicial Suits," in which Article 63 is found, describes the procedure by which "judicial" punishment may be imposed. The three parts of Chapter 3, taken together, are thus a comprehensive description of the substantive offenses which prisoners of war may commit during their imprisonment, of the penalties which may be imposed on account of such offenses, and of the procedure by which guilt may be adjudged and sentence pronounced.

We think it clear, from the context of these recited provisions, that part 3, and Article 63, which it contains, apply only to judicial proceedings directed against a prisoner of war for offenses committed while a prisoner of war. Sec-

---

or not, preventive arrest shall be reduced to the absolute minimum. Judicial proceedings against prisoners of war shall be conducted as rapidly as the circumstances permit . . . In all cases, the duration of preventive imprisonment shall be deducted from the disciplinary or judicial punishment inflicted . . ."

Article 48 provides that prisoners of war, after having suffered "the judicial or disciplinary punishment which has been imposed on them," are not to be treated differently from other prisoners, but provides that "prisoners punished as a result of attempted escape may be subjected to special surveillance." Article 49 recites that prisoners "given disciplinary punishment may not be deprived of the prerogatives attached to their rank." Articles 50 and 51 deal with escaped prisoners who have been retaken or prisoners who have attempted to escape. Article 52 provides: "Belligerents shall see that the competent authorities exercise the greatest leniency in deciding the question of whether an infraction committed by a prisoner of war should be punished by disciplinary or judicial measures. This shall be the case especially when it is a question of deciding on acts in connection with escape or attempted escape. . . . A prisoner may not be punished more than once because of the same act or the same count."

tion V gives no indication that this part was designed to deal with offenses other than those referred to in parts 1 and 2 of Chapter 3.

We cannot say that the commission, in admitting evidence to which objection is now made, violated any act of Congress, treaty or military command defining the commission's authority. For reasons already stated we hold that the commission's rulings on evidence and on the mode of conducting these proceedings against petitioner are not reviewable by the courts, but only by the reviewing military authorities. From this viewpoint it is unnecessary to consider what, in other situations, the Fifth Amendment might require, and as to that no intimation one way or the other is to be implied. Nothing we have said is to be taken as indicating any opinion on the question of the wisdom of considering such evidence, or whether the action of a military tribunal in admitting evidence, which Congress or controlling military command has directed to be excluded, may be drawn in question by petition for habeas corpus or prohibition.

*Effect of failure to give notice of the trial to the protecting power.* Article 60 of the Geneva Convention of July 27, 1929, 47 Stat. 2051, to which the United States and Japan were signatories, provides that "At the opening of a judicial proceeding directed against a prisoner of war, the detaining Power shall advise the representative of the protecting Power thereof as soon as possible, and always before the date set for the opening of the trial." Petitioner relies on the failure to give the prescribed notice to the protecting power [9] to establish want of authority in the commission to proceed with the trial.

---

[9] Switzerland, at the time of the trial, was the power designated by Japan for the protection of Japanese prisoners of war detained by the United States, except in Hawaii. U. S. Dept. of State Bull., Vol. XIII, No. 317, p. 125.

For reasons already stated we conclude that Article 60 of the Geneva Convention, which appears in part 3, Chapter 3, § V, Title III of the Geneva Convention, applies only to persons who are subjected to judicial proceedings for offenses committed while prisoners of war.[10]

---

[10] One of the items of the bill of particulars, in support of the charge against petitioner, specifies that he permitted members of the armed forces under his command to try and execute three named and other prisoners of war, "subjecting to trial without prior notice to a representative of the protecting power, without opportunity to defend, and without counsel; denying opportunity to appeal from the sentence rendered; failing to notify the protecting power of the sentence pronounced; and executing a death sentence without communicating to the representative of the protecting power the nature and circumstances of the offense charged." It might be suggested that if Article 60 is inapplicable to petitioner it is inapplicable in the cases specified, and that hence he could not be lawfully held or convicted on a charge of failing to require the notice, provided for in Article 60, to be given.

As the Government insists, it does not appear from the charge and specifications that the prisoners in question were not charged with offenses committed by them as prisoners rather than with offenses against the law of war committed by them as enemy combatants. But apart from this consideration, independently of the notice requirements of the Geneva Convention, it is a violation of the law of war, on which there could be a conviction if supported by evidence, to inflict capital punishment on prisoners of war without affording to them opportunity to make a defense. 2 Winthrop, *supra*, *434–435, 1241; Article 84, Oxford Manual, Laws and Customs of War on Land; U. S. War Dept., Basic Field Manual, Rules of Land Warfare (1940) par. 356; Lieber's Code, G. O. No. 100 (1863) Instructions for the Government of Armies of the United States in the Field, par. 12; Spaight, War Rights on Land, 462, n.

Further, the commission, in making its findings, summarized as follows the charges, on which it acted, in three classes, any one of which, independently of the others if supported by evidence, would be sufficient to support the conviction: (1) execution or massacre without trial and maladministration generally of civilian internees and prisoners of war; (2) brutalities committed upon the civilian population, and (3) burning and demolition, without adequate military necessity, of a

It thus appears that the order convening the commission was a lawful order, that the commission was lawfully constituted, that petitioner was charged with violation of the law of war, and that the commission had authority to proceed with the trial, and in doing so did not violate any military, statutory or constitutional command. We have considered, but find it unnecessary to discuss, other contentions which we find to be without merit. We therefore conclude that the detention of petitioner for trial and his detention upon his conviction, subject to the prescribed review by the military authorities, were lawful, and that the petition for certiorari, and leave to file in this Court

large number of homes, places of business, places of religious worship, hospitals, public buildings and educational institutions.

The commission concluded: "(1) That a series of atrocities and other high crimes have been committed by members of the Japanese armed forces" under command of petitioner "against people of the United States, their allies and dependencies . . .; that they were not sporadic in nature but in many cases were methodically supervised by Japanese officers and noncommissioned officers"; (2) that during the period in question petitioner "failed to provide effective control of . . . [his] troops, as was required by the circumstances." The commission said: ". . . where murder and rape and vicious, revengeful actions are widespread offenses, and there is no effective attempt by a commander to discover and control the criminal acts, such a commander may be held responsible, even criminally liable, for the lawless acts of his troops, depending upon their nature and the circumstances surrounding them."

The commission made no finding of non-compliance with the Geneva Convention. Nothing has been brought to our attention from which we could conclude that the alleged non-compliance with Article 60 of the Geneva Convention had any relation to the commission's finding of a series of atrocities committed by members of the forces under petitioner's command, and that he failed to provide effective control of his troops, as was required by the circumstances; or which could support the petitions for habeas corpus on the ground that petitioner had been charged with or convicted for failure to require the notice prescribed by Article 60 to be given.

petitions for writs of habeas corpus and prohibition should be, and they are

*Denied.*

Mr. Justice Jackson took no part in the consideration or decision of these cases.

Mr. Justice Murphy, dissenting.

The significance of the issue facing the Court today cannot be overemphasized. An American military commission has been established to try a fallen military commander of a conquered nation for an alleged war crime. The authority for such action grows out of the exercise of the power conferred upon Congress by Article I, § 8, Cl. 10 of the Constitution to "define and punish . . . Offences against the Law of Nations . . ." The grave issue raised by this case is whether a military commission so established and so authorized may disregard the procedural rights of an accused person as guaranteed by the Constitution, especially by the due process clause of the Fifth Amendment.

The answer is plain. The Fifth Amendment guarantee of due process of law applies to "any person" who is accused of a crime by the Federal Government or any of its agencies. No exception is made as to those who are accused of war crimes or as to those who possess the status of an enemy belligerent. Indeed, such an exception would be contrary to the whole philosophy of human rights which makes the Constitution the great living document that it is. The immutable rights of the individual, including those secured by the due process clause of the Fifth Amendment, belong not alone to the members of those nations that excel on the battlefield or that subscribe to the democratic ideology. They belong to every person in the world, victor or vanquished, whatever may be his race, color or beliefs. They rise above any status of belligerency or outlawry. They survive any popular passion or frenzy of the moment. No court or legislature or executive, not even the mightiest

army in the world, can ever destroy them. Such is the universal and indestructible nature of the rights which the due process clause of the Fifth Amendment recognizes and protects when life or liberty is threatened by virtue of the authority of the United States.

The existence of these rights, unfortunately, is not always respected. They are often trampled under by those who are motivated by hatred, aggression or fear. But in this nation individual rights are recognized and protected, at least in regard to governmental action. They cannot be ignored by any branch of the Government, even the military, except under the most extreme and urgent circumstances.

The failure of the military commission to obey the dictates of the due process requirements of the Fifth Amendment is apparent in this case. The petitioner was the commander of an army totally destroyed by the superior power of this nation. While under heavy and destructive attack by our forces, his troops committed many brutal atrocities and other high crimes. Hostilities ceased and he voluntarily surrendered. At that point he was entitled, as an individual protected by the due process clause of the Fifth Amendment, to be treated fairly and justly according to the accepted rules of law and procedure. He was also entitled to a fair trial as to any alleged crimes and to be free from charges of legally unrecognized crimes that would serve only to permit his accusers to satisfy their desires for revenge.

A military commission was appointed to try the petitioner for an alleged war crime. The trial was ordered to be held in territory over which the United States has complete sovereignty. No military necessity or other emergency demanded the suspension of the safeguards of due process. Yet petitioner was rushed to trial under an improper charge, given insufficient time to prepare an adequate defense, deprived of the benefits of some of the most

28

elementary rules of evidence and summarily sentenced to be hanged.   In all this needless and unseemly haste there was no serious attempt to charge or to prove that he committed a recognized violation of the laws of war.   He was not charged with personally participating in the acts of atrocity or with ordering or condoning their commission. Not even knowledge of these crimes was attributed to him. It was simply alleged that he unlawfully disregarded and failed to discharge his duty as commander to control the operations of the members of his command, permitting them to commit the acts of atrocity.   The recorded annals of warfare and the established principles of international law afford not the slightest precedent for such a charge. This indictment in effect permitted the military commission to make the crime whatever it willed, dependent upon its biased view as to petitioner's duties and his disregard thereof, a practice reminiscent of that pursued in certain less respected nations in recent years.

In my opinion, such a procedure is unworthy of the traditions of our people or of the immense sacrifices that they have made to advance the common ideals of mankind. The high feelings of the moment doubtless will be satisfied. But in the sober afterglow will come the realization of the boundless and dangerous implications of the procedure sanctioned today.   No one in a position of command in an army, from sergeant to general, can escape those implications.   Indeed, the fate of some future President of the United States and his chiefs of staff and military advisers may well have been sealed by this decision.   But even more significant will be the hatred and ill-will growing out of the application of this unprecedented procedure.   That has been the inevitable effect of every method of punishment disregarding the element of personal culpability. The effect in this instance, unfortunately, will be magnified infinitely, for here we are dealing with the rights of man on an international level.   To subject an enemy bel-

ligerent to an unfair trial, to charge him with an unrecognized crime, or to vent on him our retributive emotions only antagonizes the enemy nation and hinders the reconciliation necessary to a peaceful world.

That there were brutal atrocities inflicted upon the helpless Filipino people, to whom tyranny is no stranger, by Japanese armed forces under the petitioner's command is undeniable. Starvation, execution or massacre without trial, torture, rape, murder and wanton destruction of property were foremost among the outright violations of the laws of war and of the conscience of a civilized world. That just punishment should be meted out to all those responsible for criminal acts of this nature is also beyond dispute. But these factors do not answer the problem in this case. They do not justify the abandonment of our devotion to justice in dealing with a fallen enemy commander. To conclude otherwise is to admit that the enemy has lost the battle but has destroyed our ideals.

War breeds atrocities. From the earliest conflicts of recorded history to the global struggles of modern times inhumanities, lust and pillage have been the inevitable by-products of man's resort to force and arms. Unfortunately, such despicable acts have a dangerous tendency to call forth primitive impulses of vengeance and retaliation among the victimized peoples. The satisfaction of such impulses in turn breeds resentment and fresh tension. Thus does the spiral of cruelty and hatred grow.

If we are ever to develop an orderly international community based upon a recognition of human dignity it is of the utmost importance that the necessary punishment of those guilty of atrocities be as free as possible from the ugly stigma of revenge and vindictiveness. Justice must be tempered by compassion rather than by vengeance. In this, the first case involving this momentous problem ever to reach this Court, our responsibility is both lofty and difficult. We must insist, within the confines of our proper

jurisdiction, that the highest standards of justice be applied in this trial of an enemy commander conducted under the authority of the United States. Otherwise stark retribution will be free to masquerade in a cloak of false legalism. And the hatred and cynicism engendered by that retribution will supplant the great ideals to which this nation is dedicated.

This Court fortunately has taken the first and most important step toward insuring the supremacy of law and justice in the treatment of an enemy belligerent accused of violating the laws of war. Jurisdiction properly has been asserted to inquire "into the cause of restraint of liberty" of such a person. 28 U. S. C. § 452. Thus the obnoxious doctrine asserted by the Government in this case, to the effect that restraints of liberty resulting from military trials of war criminals are political matters completely outside the arena of judicial review, has been rejected fully and unquestionably. This does not mean, of course, that the foreign affairs and policies of the nation are proper subjects of judicial inquiry. But when the liberty of any person is restrained by reason of the authority of the United States the writ of habeas corpus is available to test the legality of that restraint, even though direct court review of the restraint is prohibited. The conclusive presumption must be made, in this country at least, that illegal restraints are unauthorized and unjustified by any foreign policy of the Government and that commonly accepted juridical standards are to be recognized and enforced. On that basis judicial inquiry into these matters may proceed within its proper sphere.

The determination of the extent of review of war trials calls for judicial statesmanship of the highest order. The ultimate nature and scope of the writ of habeas corpus are within the discretion of the judiciary unless validly circumscribed by Congress. Here we are confronted with a use of the writ under circumstances novel in the history of the

Court. For my own part, I do not feel that we should be confined by the traditional lines of review drawn in connection with the use of the writ by ordinary criminals who have direct access to the judiciary in the first instance. Those held by the military lack any such access; consequently the judicial review available by habeas corpus must be wider than usual in order that proper standards of justice may be enforceable.

But for the purposes of this case I accept the scope of review recognized by the Court at this time. As I understand it, the following issues in connection with war criminal trials are reviewable through the use of the writ of habeas corpus: (1) whether the military commission was lawfully created and had authority to try and to convict the accused of a war crime; (2) whether the charge against the accused stated a violation of the laws of war; (3) whether the commission, in admitting certain evidence, violated any law or military command defining the commission's authority in that respect; and (4) whether the commission lacked jurisdiction because of a failure to give advance notice to the protecting power as required by treaty or convention.

The Court, in my judgment, demonstrates conclusively that the military commission was lawfully created in this instance and that petitioner could not object to its power to try him for a recognized war crime. Without pausing here to discuss the third and fourth issues, however, I find it impossible to agree that the charge against the petitioner stated a recognized violation of the laws of war.

It is important, in the first place, to appreciate the background of events preceding this trial. From October 9, 1944, to September 2, 1945, the petitioner was the Commanding General of the 14th Army Group of the Imperial Japanese Army, with headquarters in the Philippines. The reconquest of the Philippines by the armed forces of the United States began approximately at the time when

the petitioner assumed this command. Combined with a great and decisive sea battle, an invasion was made on the island of Leyte on October 20, 1944. "In the six days of the great naval action the Japanese position in the Philippines had become extremely critical. Most of the serviceable elements of the Japanese Navy had been committed to the battle with disastrous results. The strike had miscarried, and General MacArthur's land wedge was firmly implanted in the vulnerable flank of the enemy . . . There were 260,000 Japanese troops scattered over the Philippines but most of them might as well have been on the other side of the world so far as the enemy's ability to shift them to meet the American thrusts was concerned. If General MacArthur succeeded in establishing himself in the Visayas where he could stage, exploit, and spread under cover of overwhelming naval and air superiority, nothing could prevent him from overrunning the Philippines." Biennial Report of the Chief of Staff of the United States Army, July 1, 1943, to June 30, 1945, to the Secretary of War, p. 74.

By the end of 1944 the island of Leyte was largely in American hands. And on January 9, 1945, the island of Luzon was invaded. "Yamashita's inability to cope with General MacArthur's swift moves, his desired reaction to the deception measures, the guerrillas, and General Kenney's aircraft combined to place the Japanese in an impossible situation. The enemy was forced into a piecemeal commitment of his troops." *Ibid.*, p. 78. It was at this time and place that most of the alleged atrocities took place. Organized resistance around Manila ceased on February 23. Repeated land and air assaults pulverized the enemy and within a few months there was little left of petitioner's command except a few remnants which had gathered for a last stand among the precipitous mountains.

As the military commission here noted, "The Defense established the difficulties faced by the Accused with re-

spect not only to the swift and overpowering advance of American forces, but also to the errors of his predecessors, weaknesses in organization, equipment, supply with especial reference to food and gasoline, training, communication, discipline and morale of his troops. It was alleged that the sudden assignment of Naval and Air Forces to his tactical command presented almost insurmountable difficulties. This situation was followed, the Defense contended, by failure to obey his orders to withdraw troops from Manila, and the subsequent massacre of unarmed civilians, particularly by Naval forces. Prior to the Luzon Campaign, Naval forces had reported to a separate ministry in the Japanese Government and Naval Commanders may not have been receptive or experienced in this instance with respect to a joint land operation under a single commander who was designated from the Army Service."

The day of final reckoning for the enemy arrived in August, 1945. On September 3, the petitioner surrendered to the United States Army at Baguio, Luzon. He immediately became a prisoner of war and was interned in prison in conformity with the rules of international law. On September 25, approximately three weeks after surrendering, he was served with the charge in issue in this case. Upon service of the charge he was removed from the status of a prisoner of war and placed in confinement as an accused war criminal. Arraignment followed on October 8 before a military commission specially appointed for the case. Petitioner pleaded not guilty. He was also served on that day with a bill of particulars alleging 64 crimes by troops under his command. A supplemental bill alleging 59 more crimes by his troops was filed on October 29, the same day that the trial began. No continuance was allowed for preparation of a defense as to the supplemental bill. The trial continued uninterrupted until December 5, 1945. On December 7 petitioner was found guilty as charged and was sentenced to be hanged.

The petitioner was accused of having "unlawfully disregarded and failed to discharge his duty as commander to control the operations of the members of his command, permitting them to commit brutal atrocities and other high crimes." The bills of particulars further alleged that specific acts of atrocity were committed by "members of the armed forces of Japan under the command of the accused." Nowhere was it alleged that the petitioner personally committed any of the atrocities, or that he ordered their commission, or that he had any knowledge of the commission thereof by members of his command.

The findings of the military commission bear out this absence of any direct personal charge against the petitioner. The commission merely found that atrocities and other high crimes "have been committed by members of the Japanese armed forces under your command . . . that they were not sporadic in nature but in many cases were methodically supervised by Japanese officers and noncommissioned officers; . . . That during the period in question you failed to provide effective control of your troops as was required by the circumstances."

In other words, read against the background of military events in the Philippines subsequent to October 9, 1944, these charges amount to this: "We, the victorious American forces, have done everything possible to destroy and disorganize your lines of communication, your effective control of your personnel, your ability to wage war. In those respects we have succeeded. We have defeated and crushed your forces. And now we charge and condemn you for having been inefficient in maintaining control of your troops during the period when we were so effectively besieging and eliminating your forces and blocking your ability to maintain effective control. Many terrible atrocities were committed by your disorganized troops. Because these atrocities were so widespread we will not bother to charge or prove that you committed, ordered or

condoned any of them. We will assume that they must have resulted from your inefficiency and negligence as a commander. In short, we charge you with the crime of inefficiency in controlling your troops. We will judge the discharge of your duties by the disorganization which we ourselves created in large part. Our standards of judgment are whatever we wish to make them."

Nothing in all history or in international law, at least as far as I am aware, justifies such a charge against a fallen commander of a defeated force. To use the very inefficiency and disorganization created by the victorious forces as the primary basis for condemning officers of the defeated armies bears no resemblance to justice or to military reality.

International law makes no attempt to define the duties of a commander of an army under constant and overwhelming assault; nor does it impose liability under such circumstances for failure to meet the ordinary responsibilities of command. The omission is understandable. Duties, as well as ability to control troops, vary according to the nature and intensity of the particular battle. To find an unlawful deviation from duty under battle conditions requires difficult and speculative calculations. Such calculations become highly untrustworthy when they are made by the victor in relation to the actions of a vanquished commander. Objective and realistic norms of conduct are then extremely unlikely to be used in forming a judgment as to deviations from duty. The probability that vengeance will form the major part of the victor's judgment is an unfortunate but inescapable fact. So great is that probability that international law refuses to recognize such a judgment as a basis for a war crime, however fair the judgment may be in a particular instance. It is this consideration that undermines the charge against the petitioner in this case. The indictment permits, indeed compels, the military commission of a victorious nation to

sit in judgment upon the military strategy and actions of the defeated enemy and to use its conclusions to determine the criminal liability of an enemy commander. Life and liberty are made to depend upon the biased will of the victor rather than upon objective standards of conduct.

The Court's reliance upon vague and indefinite references in certain of the Hague Conventions and the Geneva Red Cross Convention is misplaced. Thus the statement in Article 1 of the Annex to Hague Convention No. IV of October 18, 1907, 36 Stat. 2277, 2295, to the effect that the laws, rights and duties of war apply to military and volunteer corps only if they are "commanded by a person responsible for his subordinates," has no bearing upon the problem in this case. Even if it has, the clause "responsible for his subordinates" fails to state to whom the responsibility is owed or to indicate the type of responsibility contemplated. The phrase has received differing interpretations by authorities on international law. In Oppenheim, International Law (6th ed., rev. by Lauterpacht, 1940, vol. 2, p. 204, fn. 3) it is stated that "The meaning of the word 'responsible' . . . is not clear. It probably means 'responsible to some higher authority,' whether the person is appointed from above or elected from below; . . ." Another authority has stated that the word "responsible" in this particular context means "presumably to a higher authority," or "Possibly it merely means one who controls his subordinates and who therefore can be called to account for their acts." Wheaton, International Law (7th ed., by Keith, London, 1944, p. 172, fn. 30). Still another authority, Westlake, International Law (1907, Part II, p. 61), states that "Probably the responsibility intended is nothing more than a capacity of exercising effective control." Finally, Edmonds and Oppenheim, Land Warfare (1912, p. 19, par. 22) state that it is enough "if the commander of the corps is regularly or temporarily commissioned as an officer or is a person of

position and authority . . ." It seems apparent beyond dispute that the word "responsible" was not used in this particular Hague Convention to hold the commander of a defeated army to any high standard of efficiency when he is under destructive attack; nor was it used to impute to him any criminal responsibility for war crimes committed by troops under his command under such circumstances.

The provisions of the other conventions referred to by the Court are on their face equally devoid of relevance or significance to the situation here in issue. Neither Article 19 of Hague Convention No. X, 36 Stat. 2371, 2389, nor Article 26 of the Geneva Red Cross Convention of 1929, 47 Stat. 2074, 2092, refers to circumstances where the troops of a commander commit atrocities while under heavily adverse battle conditions. Reference is also made to the requirement of Article 43 of the Annex to Hague Convention No. IV, 36 Stat. 2295, 2306, that the commander of a force occupying enemy territory "shall take all the measures in his power to restore, and ensure, as far as possible, public order and safety, while respecting, unless absolutely prevented, the laws in force in the country." But the petitioner was more than a commander of a force occupying enemy territory. He was the leader of an army under constant and devastating attacks by a superior re-invading force. This provision is silent as to the responsibilities of a commander under such conditions as that.

Even the laws of war heretofore recognized by this nation fail to impute responsibility to a fallen commander for excesses committed by his disorganized troops while under attack. Paragraph 347 of the War Department publication, Basic Field Manual, Rules of Land Warfare, FM 27–10 (1940), states the principal offenses under the laws of war recognized by the United States. This includes all of the atrocities which the Japanese troops were alleged to have committed in this instance. Originally

this paragraph concluded with the statement that "The commanders ordering the commission of such acts, or under whose authority they are committed by their troops, may be punished by the belligerent into whose hands they may fall." The meaning of the phrase "under whose authority they are committed" was not clear. On November 15, 1944, however, this sentence was deleted and a new paragraph was added relating to the personal liability of those who violate the laws of war. Change 1, FM 27-10. The new paragraph 345.1 states that "Individuals and organizations who violate the accepted laws and customs of war may be punished therefor. However, the fact that the acts complained of were done pursuant to order of a superior or government sanction may be taken into consideration in determining culpability, either by way of defense or in mitigation of punishment. The person giving such orders may also be punished." From this the conclusion seems inescapable that the United States recognizes individual criminal responsibility for violations of the laws of war only as to those who commit the offenses or who order or direct their commission. Such was not the allegation here. Cf. Article 67 of the Articles of War, 10 U. S. C. § 1539.

There are numerous instances, especially with reference to the Philippine Insurrection in 1900 and 1901, where commanding officers were found to have violated the laws of war by specifically ordering members of their command to commit atrocities and other war crimes. Francisco Frani, G. O. 143, Dec. 13, 1900, Hq. Div. Phil.; Eugenio Fernandez and Juan Soriano, G. O. 28, Feb. 6, 1901, Hq. Div. Phil.; Ciriaco Cabungal, G. O. 188, Jul. 22, 1901, Hq. Div. Phil.; Natalio Valencia, G. O. 221, Aug. 17, 1901, Hq. Div. Phil.; Aniceta Angeles, G. O. 246, Sept. 2, 1901, Hq. Div. Phil.; Francisco Braganza, G. O. 291, Sept. 26, 1901, Hq. Div. Phil.; Lorenzo Andaya, G. O. 328, Oct. 25, 1901, Hq. Div. Phil. And in other cases officers have been held

liable where they knew that a crime was to be committed, had the power to prevent it and failed to exercise that power. Pedro Abad Santos, G. O. 130, June 19, 1901, Hq. Div. Phil. Cf. Pedro A. Cruz, G. O. 264, Sept. 9, 1901, Hq. Div. Phil. In no recorded instance, however, has the mere inability to control troops under fire or attack by superior forces been made the basis of a charge of violating the laws of war.

The Government claims that the principle that commanders in the field are bound to control their troops has been applied so as to impose liability on the United States in international arbitrations. *Case of Jeannaud* (1880), 3 Moore, International Arbitrations (1898) 3000; *Case of The Zafiro* (1910), 5 Hackworth, Digest of International Law (1943) 707. The difference between arbitrating property rights and charging an individual with a crime against the laws of war is too obvious to require elaboration. But even more significant is the fact that even these arbitration cases fail to establish any principle of liability where troops are under constant assault and demoralizing influences by attacking forces. The same observation applies to the common law and statutory doctrine, referred to by the Government, that one who is under a legal duty to take protective or preventive action is guilty of criminal homicide if he willfully or negligently omits to act and death is proximately caused. *State* v. *Harrison*, 107 N. J. L. 213, 152 A. 867; *State* v. *Irvine*, 126 La. 434, 52 So. 567; Holmes, The Common Law, p. 278. No one denies that inaction or negligence may give rise to liability, civil or criminal. But it is quite another thing to say that the inability to control troops under highly competitive and disastrous battle conditions renders one guilty of a war crime in the absence of personal culpability. Had there been some element of knowledge or direct connection with the atrocities the problem would be entirely different. Moreover, it must be remembered that we are not dealing

here with an ordinary tort or criminal action; precedents in those fields are of little if any value. Rather we are concerned with a proceeding involving an international crime, the treatment of which may have untold effects upon the future peace of the world. That fact must be kept uppermost in our search for precedent.

The only conclusion I can draw is that the charge made against the petitioner is clearly without precedent in international law or in the annals of recorded military history. This is not to say that enemy commanders may escape punishment for clear and unlawful failures to prevent atrocities. But that punishment should be based upon charges fairly drawn in light of established rules of international law and recognized concepts of justice.

But the charge in this case, as previously noted, was speedily drawn and filed but three weeks after the petitioner surrendered. The trial proceeded with great dispatch without allowing the defense time to prepare an adequate case. Petitioner's rights under the due process clause of the Fifth Amendment were grossly and openly violated without any justification. All of this was done without any thorough investigation and prosecution of those immediately responsible for the atrocities, out of which might have come some proof or indication of personal culpability on petitioner's part. Instead the loose charge was made that great numbers of atrocities had been committed and that petitioner was the commanding officer; hence he must have been guilty of disregard of duty. Under that charge the commission was free to establish whatever standard of duty on petitioner's part that it desired. By this flexible method a victorious nation may convict and execute any or all leaders of a vanquished foe, depending upon the prevailing degree of vengeance and the absence of any objective judicial review.

At a time like this when emotions are understandably high it is difficult to adopt a dispassionate attitude toward

a case of this nature. Yet now is precisely the time when that attitude is most essential. While peoples in other lands may not share our beliefs as to due process and the dignity of the individual, we are not free to give effect to our emotions in reckless disregard of the rights of others. We live under the Constitution, which is the embodiment of all the high hopes and aspirations of the new world. And it is applicable in both war and peace. We must act accordingly. Indeed, an uncurbed spirit of revenge and retribution, masked in formal legal procedure for purposes of dealing with a fallen enemy commander, can do more lasting harm than all of the atrocities giving rise to that spirit. The people's faith in the fairness and objectiveness of the law can be seriously undercut by that spirit. The fires of nationalism can be further kindled. And the hearts of all mankind can be embittered and filled with hatred, leaving forlorn and impoverished the noble ideal of malice toward none and charity to all. These are the reasons that lead me to dissent in these terms.

MR. JUSTICE RUTLEDGE, dissenting.

Not with ease does one find his views at odds with the Court's in a matter of this character and gravity. Only the most deeply felt convictions could force one to differ. That reason alone leads me to do so now, against strong considerations for withholding dissent.

More is at stake than General Yamashita's fate. There could be no possible sympathy for him if he is guilty of the atrocities for which his death is sought. But there can be and should be justice administered according to law. In this stage of war's aftermath it is too early for Lincoln's great spirit, best lighted in the Second Inaugural, to have wide hold for the treatment of foes. It is not too early, it is never too early, for the nation steadfastly to follow its great constitutional traditions, none older or more universally protective against unbridled power than due process

of law in the trial and punishment of men, that is, of all men, whether citizens, aliens, alien enemies or enemy belligerents. It can become too late.

This long-held attachment marks the great divide between our enemies and ourselves. Theirs was a philosophy of universal force. Ours is one of universal law, albeit imperfectly made flesh of our system and so dwelling among us. Every departure weakens the tradition, whether it touches the high or the low, the powerful or the weak, the triumphant or the conquered. If we need not or cannot be magnanimous, we can keep our own law on the plane from which it has not descended hitherto and to which the defeated foes' never rose.

With all deference to the opposing views of my brethren, whose attachment to that tradition needless to say is no less than my own, I cannot believe in the face of this record that the petitioner has had the fair trial our Constitution and laws command. Because I cannot reconcile what has occurred with their measure, I am forced to speak. At bottom my concern is that we shall not forsake in any case, whether Yamashita's or another's, the basic standards of trial which, among other guaranties, the nation fought to keep; that our system of military justice shall not alone among all our forms of judging be above or beyond the fundamental law or the control of Congress within its orbit of authority; and that this Court shall not fail in its part under the Constitution to see that these things do not happen.

This trial is unprecedented in our history. Never before have we tried and convicted an enemy general for action taken during hostilities or otherwise in the course of military operations or duty. Much less have we condemned one for failing to take action. The novelty is not lessened by the trial's having taken place after hostilities ended and the enemy, including the accused, had surrendered. Moreover, so far as the time permitted for our

consideration has given opportunity, I have not been able to find precedent for the proceeding in the system of any nation founded in the basic principles of our constitutional democracy, in the laws of war or in other internationally binding authority or usage.

The novelty is legal as well as historical. We are on strange ground. Precedent is not all-controlling in law. There must be room for growth, since every precedent has an origin. But it is the essence of our tradition for judges, when they stand at the end of the marked way, to go forward with caution keeping sight, so far as they are able, upon the great landmarks left behind and the direction they point ahead. If, as may be hoped, we are now to enter upon a new era of law in the world, it becomes more important than ever before for the nations creating that system to observe their greatest traditions of administering justice, including this one, both in their own judging and in their new creation. The proceedings in this case veer so far from some of our time-tested road signs that I cannot take the large strides validating them would demand.

## I.

It is not in our tradition for anyone to be charged with crime which is defined after his conduct, alleged to be criminal, has taken place; [1] or in language not sufficient to inform him of the nature of the offense or to enable him to make defense.[2] Mass guilt we do not impute to individuals, perhaps in any case but certainly in none where the person is not charged or shown actively to have participated in or knowingly to have failed in taking action to

---

[1] *Cummings* v. *Missouri,* 4 Wall. 277; *Kring* v. *Missouri,* 107 U. S. 221.

[2] *Armour Packing Co.* v. *United States,* 209 U. S. 56, 83–84; *United States* v. *Cohen Grocery Co.,* 255 U. S. 81; cf. *Screws* v. *United States,* 325 U. S. 91. See note 17 and text.

prevent the wrongs done by others, having both the duty and the power to do so.

It is outside our basic scheme to condemn men without giving reasonable opportunity for preparing defense;[3] in capital or other serious crimes to convict on "official documents . . .; affidavits; . . . documents or translations thereof; diaries . . ., photographs, motion picture films, and . . . newspapers"[4] or on hearsay, once, twice or thrice removed,[5] more particularly when the documentary evidence or some of it is prepared *ex parte* by the prosecuting authority and includes not only opinion but conclusions of guilt. Nor in such cases do we deny the rights of confrontation of witnesses and cross-examination.[6]

Our tradition does not allow conviction by tribunals both authorized and bound[7] by the instrument of their creation to receive and consider evidence which is expressly excluded by Act of Congress or by treaty obligation; nor is it in accord with our basic concepts to make the tribunal, specially constituted for the particular trial, regardless of those prohibitions the sole and exclusive judge of the cred-

---

[3] *Hawk* v. *Olson*, 326 U. S. 271; *Snyder* v. *Massachusetts*, 291 U. S. 97, 105: "What may not be taken away is notice of the charge and an adequate opportunity to be heard in defense of it." See Part III.

[4] The commission's findings state: "We have received for analysis and evaluation 423 exhibits consisting of official documents of the United States Army, The United States State Department, and the Commonwealth of the Philippines; affidavits; captured enemy documents or translations thereof; diaries taken from Japanese personnel, photographs, motion picture films, and Manila newspapers." See notes 19 and 20.

Concerning the specific nature of these elements in the proof, the issues to which they were directed, and their prejudicial effects, see text *infra* and notes in Part II.

[5] *Queen* v. *Hepburn*, 7 Cranch 290; *Donnelly* v. *United States*, 228 U. S. 243, 273. See Part II; note 21.

[6] *Motes* v. *United States*, 178 U. S. 458; *Paoni* v. *United States*, 281 F. 801. See Parts II and III.

[7] See Part II at notes 10, 19; Part III.

ibility, probative value and admissibility of whatever may be tendered as evidence.

The matter is not one merely of the character and admissibility of evidence. It goes to the very competency of the tribunal to try and punish consistently with the Constitution, the laws of the United States made in pursuance thereof, and treaties made under the nation's authority.

All these deviations from the fundamental law, and others, occurred in the course of constituting the commission, the preparation for trial and defense, the trial itself, and therefore, in effect, in the sentence imposed. Whether taken singly in some instances as departures from specific constitutional mandates or in totality as in violation of the Fifth Amendment's command that *no* person shall be deprived of life, liberty or property without due process of law, a trial so vitiated cannot withstand constitutional scrutiny.

One basic protection of our system and one only, petitioner has had. He has been represented by able counsel, officers of the army he fought. Their difficult assignment has been done with extraordinary fidelity, not only to the accused, but to their high conception of military justice, always to be administered in subordination to the Constitution and consistent Acts of Congress and treaties. But, as will appear, even this conceded shield was taken away in much of its value, by denial of reasonable opportunity for them to perform their function.

On this denial and the commission's invalid constitution specifically, but also more generally upon the totality of departures from constitutional norms inherent in the idea of a fair trial, I rest my judgment that the commission was without jurisdiction from the beginning to try or punish the petitioner and that, if it had acquired jurisdiction then, its power to proceed was lost in the course of what was done before and during trial.

Only on one view, in my opinion, could either of these conclusions be avoided. This would be that an enemy

belligerent in petitioner's position is altogether beyond the pale of constitutional protection, regardless of the fact that hostilities had ended and he had surrendered with his country. The Government has so argued, urging that we are still at war with Japan and all the power of the military effective during active hostilities in theatres of combat continues in full force unaffected by the events of August 14, 1945, and after.

In this view the action taken here is one of military necessity, exclusively within the authority of the President as Commander-in-Chief and his military subordinates to take in warding off military danger and subject to no judicial restraint on any account, although somewhat inconsistently it is said this Court may "examine" the proceedings generally.

As I understand the Court, this is in substance the effect of what has been done. For I cannot conceive any instance of departure from our basic concepts of fair trial, if the failures here are not sufficient to produce that effect.

We are technically still at war, because peace has not been negotiated finally or declared. But there is no longer the danger which always exists before surrender and armistice. Military necessity does not demand the same measures. The nation may be more secure now than at any time after peace is officially concluded. In these facts is one great difference from *Ex parte Quirin,* 317 U. S. 1. Punitive action taken now can be effective only for the next war, for purposes of military security. And enemy aliens, including belligerents, need the attenuated protections our system extends to them more now than before hostilities ceased or than they may after a treaty of peace is signed. Ample power there is to punish them or others for crimes, whether under the laws of war during its course or later during occupation. There can be no question of that. The only question is how it shall be done, consist-

ently with universal constitutional commands or outside their restricting effects. In this sense I think the Constitution follows the flag.

The other thing to be mentioned in order to be put aside is that we have no question here of what the military might have done in a field of combat. There the maxim about the law becoming silent in the noise of arms applies. The purpose of battle is to kill. But it does not follow that this would justify killing by trial after capture or surrender, without compliance with laws or treaties made to apply in such cases, whether trial is before or after hostilities end.

I turn now to discuss some of the details of what has taken place. My basic difference is with the Court's view that provisions of the Articles of War and of treaties are not made applicable to this proceeding and with its ruling that, absent such applicable provisions, none of the things done so vitiated the trial and sentence as to deprive the commission of jurisdiction.

My brother MURPHY has discussed the charge with respect to the substance of the crime. With his conclusions in this respect I agree. My own primary concern will be with the constitution of the commission and other matters taking place in the course of the proceedings, relating chiefly to the denial of reasonable opportunity to prepare petitioner's defense and the sufficiency of the evidence, together with serious questions of admissibility, to prove an offense, all going as I think to the commission's jurisdiction.

Necessarily only a short sketch can be given concerning each matter. And it may be stated at the start that, although it was ruled in *Ex parte Quirin, supra,* that this Court had no function to review the evidence, it was not there or elsewhere determined that it could not ascertain whether conviction is founded upon evidence expressly excluded by Congress or treaty; nor does the Court purport to do so now.

## II.

### Invalidity of the Commission's Constitution.

The fountainhead of the commission's authority was General MacArthur's directive by which General Styer was ordered to and pursuant to which he did proceed with constituting the commission.[8] The directive was accompanied by elaborate and detailed rules and regulations prescribing the procedure and rules of evidence to be followed, of which for present purposes § 16, set forth below,[9] is crucial.

---

[8] The line of authorization within the military hierarchy extended from the President, through the Joint Chiefs of Staff and General Mac-Arthur, to General Styer, whose order of September 25th and others were made pursuant to and in conformity with General MacArthur's directive. The charge was prepared by the Judge Advocate General's Department of the Army. There is no dispute concerning these facts or that the directive was binding on General Styer and the commission, though it is argued his own authority as area commanding general was independently sufficient to sustain what was done.

[9] "16. Evidence.—a. The commission shall admit such evidence as in its opinion would be of assistance in proving or disproving the charge, or such as in the commission's opinion would have probative value in the mind of a reasonable man. In particular, and without limiting in any way the scope of the foregoing general rules, the following evidence may be admitted:

(1) Any document which appears to the commission to have been signed or issued officially by any officer, department, agency, or member of the armed forces of any government, without proof of the signature or of the issuance of the document.

(2) Any report which appears to the commission to have been signed or issued by the International Red Cross or a member thereof, or by a medical doctor or any medical service personnel, or by an investigator or intelligence officer, or by any other person whom the commission finds to have been acting in the course of his duty when making the report.

(3) Affidavits, depositions, or other statements taken by an officer detailed for that purpose by military authority.

(4) Any diary, letter or other document appearing to the commission to contain information relating to the charge.

(5) A copy of any document or other secondary evidence of its contents, if the commission believes that the original is not available or cannot be produced without undue delay. . . ."

Section 16, as will be noted, permits reception of documents, reports, affidavits, depositions, diaries, letters, copies of documents or other secondary evidence of their contents, hearsay, opinion evidence and conclusions, in fact of anything which in the commission's opinion "would be of assistance in proving or disproving the charge," without any of the usual modes of authentication.

A more complete abrogation of customary safeguards relating to the proof, whether in the usual rules of evidence or any reasonable substitute and whether for use in the trial of crime in the civil courts or military tribunals, hardly could have been made. So far as the admissibility and probative value of evidence was concerned, the directive made the commission a law unto itself.

It acted accordingly. As against insistent and persistent objection to the reception of all kinds of "evidence," oral, documentary and photographic, for nearly every kind of defect under any of the usual prevailing standards for admissibility and probative value, the commission not only consistently ruled against the defense, but repeatedly stated it was bound by the directive to receive the kinds of evidence it specified,[10] reprimanded counsel for continuing to make objection, declined to hear further objections, and in more than one instance during the course of the proceedings reversed its rulings favorable to the defense, where initially it had declined to receive what the prosecution offered. Every conceivable kind of statement, rumor, report, at first, second, third or further hand, written, printed or oral, and one "propaganda" film were allowed to come in, most of this relating to atrocities committed

---

[10] In one instance the president of the commission said: "The rules and regulations which guide this Commission are binding upon the Commission and agencies provided to assist the Commission. . . . We have been authorized to receive and weigh such evidence as we can consider to have probative value, and further comments by the Defense on the right which we have to accept this evidence is decidedly out of order." But see note 19.

by troops under petitioner's command throughout the several thousand islands of the Philippine Archipelago during the period of active hostilities covered by the American forces' return to and recapture of the Philippines.[11]

The findings reflect the character of the proof and the charge. The statement quoted above [12] gives only a numerical idea of the instances in which ordinary safeguards in reception of written evidence were ignored. In addition to these 423 "exhibits," the findings state the commission "has heard 286 persons during the course of this trial, most of whom have given eye-witness accounts of what they endured or what they saw."

But there is not a suggestion in the findings that petitioner personally participated in, was present at the occurrence of, or ordered any of these incidents, with the exception of the wholly inferential suggestion noted below. Nor is there any express finding that he knew of any one of the incidents in particular or of all taken together. The only inferential findings that he had knowledge, or that the commission so found, are in the statement that the "crimes *alleged to have been permitted* by the Accused in violation of the laws of war may be grouped into three categories" set out below,[13] in the further statement that "the Prose-

---

[11] Cf. text *infra* at note 19 concerning the prejudicial character of the evidence.

[12] Note 4.

[13] Namely, "(1) Starvation, execution or massacre without trial and maladministration generally of civilian internees and prisoners of war; (2) Torture, rape, murder and mass execution of very large numbers of residents of the Philippines, including women and children and members of religious orders, by starvation, beheading, bayoneting, clubbing, hanging, burning alive, and destruction by explosives; (3) Burning and demolition without adequate military necessity of large numbers of homes, places of business, places of religious worship, hospitals, public buildings, and educational institutions. In point of time, the offenses extended throughout the period the Accused was in command of Japanese troops in the Philippines. In point of area, the crimes extended throughout the Philippine Archipelago, although by far the most of the incredible acts occurred on Luzon."

cution presented evidence to show that the crimes were so extensive and widespread, both as to time and area,[14] that *they must* either have been *wilfully permitted* by the Accused, *or secretly ordered* by" him; and in the conclusion of guilt and the sentence.[15] (Emphasis added.) Indeed the commission's ultimate findings [16] draw no express conclusion of knowledge, but state only two things: (1) the fact of widespread atrocities and crimes; (2) that petitioner "failed to provide effective control . . . as was required by the circumstances."

This vagueness, if not vacuity, in the findings runs throughout the proceedings, from the charge itself through the proof and the findings, to the conclusion. It affects

---

[14] Cf. note 13.

[15] In addition the findings set forth that captured orders of subordinate officers gave proof that "they, at least," ordered acts "leading directly to" atrocities; that "the *proof offered* to the Commission *alleged* criminal *neglect* . . . as well as complete failure *by the higher echelons* of command *to detect* and prevent cruel and inhuman treatment accorded by local commanders and guards"; and that, although the "Defense established the difficulties faced by the Accused" with special reference among other things to the discipline and morale of his troops under the "swift and overpowering advance of American forces," and notwithstanding he had stoutly maintained his complete ignorance of the crimes, still he was an officer of long experience; his assignment was one of broad responsibility; it was his duty *"to discover* and control" crimes by his troops, if widespread, and therefore

"The Commission concludes: (1) That a series of atrocities and other high crimes have been committed by members of the Japanese armed forces under your command against people of the United States, their allies and dependencies throughout the Philippine Islands; that they were not sporadic in nature but in many cases were methodically supervised by Japanese officers and noncommissioned officers; (2) That during the period in question you failed to provide effective control of your troops as was required by the circumstances.

"Accordingly upon secret written ballot, two-thirds or more of the members concurring, the Commission finds you guilty as charged and sentences you to death by hanging." (Emphasis added.)

[16] See note 15.

the very gist of the offense, whether that was wilful, informed and intentional omission to restrain and control troops *known* by petitioner to be committing crimes or was only a negligent failure on his part *to discover* this and take whatever measures he then could to stop the conduct.

Although it is impossible to determine from what is before us whether petitioner in fact has been convicted of one or the other or of both these things,[17] the case has been

---

[17] The charge, set forth at the end of this note, is consistent with either theory—or both—and thus ambiguous, as were the findings. See note 15. The only word implying knowledge was "permitting." If "wilfully" is essential to constitute a crime or charge of one, otherwise subject to the objection of "vagueness," cf. *Screws* v. *United States*, 325 U. S. 91, it would seem that "permitting" alone would hardly be sufficient to charge "wilful and intentional" action or omission; and, if taken to be sufficient to charge knowledge, it would follow necessarily that the charge itself was not drawn to state and was insufficient to support a finding of mere failure to detect or discover the criminal conduct of others.

At the most, "permitting" could charge knowledge only by inference or implication. And reasonably the word could be taken in the context of the charge to mean "allowing" or "not preventing," a meaning consistent with absence of knowledge and mere failure to discover. In capital cases such ambiguity is wholly out of place. The proof was equally ambiguous in the same respect, so far as we have been informed, and so, to repeat, were the findings. The use of "wilfully," even qualified by a "must have," one time only in the findings hardly can supply the absence of that or an equivalent word or language in the charge or in the proof to support that essential element in the crime.

The charge was as follows: "Tomoyuki Yamashita, General Imperial Japanese Army, between 9 October 1944 and 2 September 1945, at Manila and at other places in the Philippine Islands, while commander of armed forces of Japan at war with the United States of America and its allies, unlawfully disregarded and failed to discharge his duty as commander to control the operations of the members of his command, permitting them to commit brutal atrocities and other high crimes against people of the United States and of its allies and dependencies, particularly the Philippines; and he, General Tomoyuki Yamashita, thereby violated the laws of war."

presented on the former basis and, unless as is noted below there is fatal duplicity, it must be taken that the crime charged and sought to be proved was only the failure, with knowledge, to perform the commander's function of control, although the Court's opinion nowhere expressly declares that knowledge was essential to guilt or necessary to be set forth in the charge.

It is in respect to this feature especially, quite apart from the reception of unverified rumor, report, etc., that perhaps the greatest prejudice arose from the admission of untrustworthy, unverified, unauthenticated evidence which could not be probed by cross-examination or other means of testing credibility, probative value or authenticity.

Counsel for the defense have informed us in the brief and at the argument that the sole proof of knowledge introduced at the trial was in the form of ex parte affidavits and depositions. Apart from what has been excerpted from the record in the applications and the briefs, and such portions of the record as I have been able to examine, it has been impossible for me fully to verify counsel's statement in this respect. But the Government has not disputed it; and it has maintained that we have no right to examine the record upon any question "of evidence." Accordingly, without concession to that view, the statement of counsel is taken for the fact. And in that state of things petitioner has been convicted of a crime in which knowledge is an essential element, with no proof of knowledge other than what would be inadmissible in any other capital case or proceeding under our system, civil or military, and which furthermore Congress has expressly commanded shall not be received in such cases tried by military commissions and other military tribunals.[18]

Moreover counsel assert in the brief, and this also is not denied, that the sole proof made of certain of the specifi-

---

[18] Cf. text *infra* Part IV.

cations in the bills of particulars was by ex parte affidavits. It was in relation to this also vital phase of the proof that there occurred one of the commission's reversals of its earlier rulings in favor of the defense,[19] a fact in itself conclusive demonstration of the necessity to the prosecution's case of the prohibited type of evidence and of its prejudicial effects upon the defense.

These two basic elements in the proof, namely, proof of knowledge of the crimes and proof of the specifications in the bills, that is, of the atrocities themselves, constitute the most important instances perhaps, if not the most fla-

---

[19] On November 1, early in the trial, the president of the commission stated: "I think the Prosecution should consider the desirability of striking certain items. The Commission feels that there must be witnesses introduced on each of the specifications or items. *It has no objection to considering affidavits, but it is unwilling to form an opinion of a particular item based solely on an affidavit.* Therefore, until evidence is introduced, these particular exhibits are rejected." (Emphasis added.)

Later evidence of the excluded type was offered, to introduction of which the defense objected on various grounds including the prior ruling. At the prosecution's urging the commission withdrew to deliberate. Later it announced that "after further consideration, the Commission reverses that ruling [of November 1] and affirms its prerogative of receiving and considering affidavits or depositions, if it chooses to do so, for whatever probative value the Commission believes they may have, without regard to the presentation of some partially corroborative oral testimony." It then added: "The Commission *directs* the Prosecution again to introduce the affidavits or depositions then in question, and other documents of a similar nature which the Prosecution stated had been prepared for introduction." (Emphasis added.)

Thereafter this type of evidence was consistently received and again, by the undisputed statement of counsel, as the sole proof of many of the specifications of the bills, a procedure which they characterize correctly in my view as having "in effect, stripped the proceeding of all semblance of a trial and converted it into an ex parte investigation."

grant,[20] of departure not only from the express command of Congress against receiving such proof but from the whole British-American tradition of the common law and the Constitution. Many others occurred, which there is neither time nor space to mention.[21]

Petitioner asserts, and there can be no reason to doubt, that by the use of all this forbidden evidence he was deprived of the right of cross-examination and other means to establish the credibility of the deponents or affiants, not to speak of the authors of reports, letters, documents and newspaper articles; of opportunity to determine whether the multitudinous crimes specified in the bills were committed in fact by troops under his command or by naval or air force troops not under his command at the time alleged; to ascertain whether the crimes attested were isolated acts of individual soldiers or were military acts committed by troop units acting under supervision of officers; and, finally, whether "in short, there was such a 'pattern' of" conduct as the prosecution alleged and its whole theory of the crime and the evidence required to be made out.

He points out in this connection that the commission based its decision on a finding as to the extent and number

---

[20] This perhaps consisted in the showing of the so-called "propaganda" film, "Orders from Tokyo," portraying scenes of battle destruction in Manila, which counsel say "was not in itself seriously objectionable." Highly objectionable, inflammatory and prejudicial, however, was the accompanying sound track with comment that the film was "evidence which will convict," mentioning petitioner specifically by name.

[21] Innumerable instances of hearsay, once or several times removed, relating to all manner of incidents, rumors, reports, etc., were among these. Many instances, too, are shown of the use of opinion evidence and conclusions of guilt, including reports made after ex parte investigations by the War Crimes Branch of the Judge Advocate General's Department, which it was and is urged had the effect of "putting the prosecution on the witness stand" and of usurping the commission's function as judge of the law and the facts. It is said also that some of the reports were received as the sole proof of some of the specifications.

of the atrocities and that this of itself establishes the prejudicial effect of the affidavits, etc., and of the denial resulting from their reception of any means of probing the evidence they contained, including all opportunity for cross-examination. Yet it is said there is no sufficient showing of prejudice. The effect could not have been other than highly prejudicial. The matter is not one merely of "rules of evidence." It goes, as will appear more fully later, to the basic right of defense, including some fair opportunity to test probative value.

Insufficient as this recital is to give a fair impression of what was done, it is enough to show that this was no trial in the traditions of the common law and the Constitution. If the tribunal itself was not strange to them otherwise, it was in its forms and modes of procedure, in the character and substance of the evidence it received, in the denial of all means to the accused and his counsel for testing the evidence, in the brevity and ambiguity of its findings made upon such a mass of material and, as will appear, in the denial of any reasonable opportunity for preparation of the defense. Because this last deprivation not only is important in itself, but is closely related to the departures from all limitations upon the character of and modes of making the proof, it will be considered before turning to the important legal questions relating to whether all these violations of our traditions can be brushed aside as not forbidden by the valid Acts of Congress, treaties and the Constitution, in that order. If all these traditions can be so put away, then indeed will we have entered upon a new but foreboding era of law.

### III.

*Denial of Opportunity to Prepare Defense.*

Petitioner surrendered September 3, 1945, and was interned as a prisoner of war in conformity with Article 9

of the Geneva Convention of July 27, 1929.[22] He was served with the charge on September 25 and put in confinement as an accused war criminal. On October 8 he was arraigned and pleaded not guilty. On October 29 the trial began and it continued until December 7, when sentence was pronounced, exactly four years almost to the hour from the attack on Pearl Harbor.

On the day of arraignment, October 8, three weeks before the trial began, petitioner was served with a bill of particulars specifying 64 items setting forth a vast number of atrocities and crimes allegedly committed by troops under his command.[23] The six officers appointed as defense counsel thus had three weeks, it is true at the prosecution's suggestion a week longer than they sought at first, to investigate and prepare to meet all these items and the large number of incidents they embodied, many of which had occurred in distant islands of the archipelago. There is some question whether they then anticipated the full scope and character of the charge or the evidence they would have to meet. But, as will appear, they worked night and day at the task. Even so it would have been impossible to do thoroughly, had nothing more occurred.

But there was more. On the first day of the trial, October 29, the prosecution filed a supplemental bill of par-

---

[22] Also with Paragraph 82 of the Rules of Land Warfare.

[23] Typical of the items are allegations that members of the armed forces of Japan under the command of the accused committed the acts "During the months of October, November and December 1944 [of] brutally mistreating and torturing numerous unarmed noncombatant civilians at the Japanese Military Police Headquarters located at Cortabitarte and Mabini Streets, Manila" and "On about 19 February 1945, in the Town of Cuenca, Batangas Province, brutally mistreating, massacring and killing Jose M. Laguo, Esteban Magsamdol, Jose Lanbo, Felisa Apuntar, Elfidio Lunar, Victoriana Ramo, and 978 other persons, all unarmed noncombatant civilians, pillaging and unnecessary [sic], deliberately and wantonly devastating, burning and destroying large areas of that town."

ticulars, containing 59 more specifications of the same general character, involving perhaps as many incidents occurring over an equally wide area.[24] A copy had been given the defense three days earlier. One item, No. 89, charged that American soldiers, prisoners of war, had been tried and executed without notice having been given to the protecting power of the United States in accordance with the requirements of the Geneva Convention, which it is now argued, strangely, the United States was not required to observe as to petitioner's trial.[25]

But what is more important is that defense counsel, as they felt was their duty, at once moved for a continuance.[26] The application was denied. However the commission indicated that if, at the end of the prosecution's presenta-

---

[24] The supplemental bill contains allegations similar to those set out in the original bill. See note 23. For example, it charged that members of the armed forces of Japan under the command of the accused "during the period from 9 October 1944 to about 1 February 1945, at Cavite City, Imus, and elsewhere in Cavite Province," were permitted to commit the acts of "brutally mistreating, torturing, and killing or attempting to kill, without cause or trial, unarmed noncombatant civilians."

[25] See note 39 and text, Part V.

[26] In support of the motion counsel indicated surprise by saying that, though it was assumed two or three new specifications might be added, there had been no expectation of 59 "about entirely different persons and times." The statement continued:

"We have worked earnestly seven days a week in order to prepare the defense on 64 specifications. And when I say 'prepare the defense,' sir, I do not mean merely an affirmative defense, but to acquaint ourselves with the facts so that we could properly cross examine the Prosecution's witnesses.

". . . 'In advance of trial' means: Sufficient time to allow the Defense a chance to prepare its defense.

"We earnestly state that we must have this time in order to adequately prepare a defense. I might add, sir, we think that this is important to the Accused, but far more important than any rights of this Accused, we believe, is the proposition that this Commission should not deviate from a fundamental American concept of fairness . . ."

tion concerning the original bill, counsel should "believe they require additional time . . ., the Commission will consider such a motion at that time," before taking up the items of the supplemental bill. Counsel again indicated, without other result, that time was desired at once "as much, if not more" to prepare for cross-examination "as the Prosecution's case goes in" as to prepare affirmative defense.

On the next day, October 30, the commission interrupted the prosecutor to say it would not then listen to testimony or discussion upon the supplemental bill. After colloquy it adhered to its prior ruling and, in response to inquiry from the prosecution, the defense indicated it would require two weeks before it could proceed on the supplemental bill. On November 1 the commission ruled it would not receive affidavits without corroboration by witnesses on any specification, a ruling reversed four days later.

On November 2, after the commission had received an affirmative answer to its inquiry whether the defense was prepared to proceed with an item in the supplemental bill which the prosecution proposed to prove, it announced: "Hereafter, then, unless there is no [sic] objection by the Defense, the Commission will assume that you are prepared to proceed with any items in the Supplemental Bill." On November 8, the question arose again upon the prosecution's inquiry as to when the defense would be ready to proceed on the supplemental bill, the prosecutor adding: "Frankly, sir, it took the War Crimes Commission some three months to investigate these matters and I cannot conceive of the Defense undertaking a similar investigation with any less period of time." Stating it realized "the tremendous task which we placed upon the Defense" and its "determination to give them the time they require," the commission again adhered to its ruling of October 29.

Four days later the commission announced it would grant a continuance "only for the most urgent and unavoidable reasons." [27]

On November 20, when the prosecution rested, senior defense counsel moved for a reasonable continuance, recalling the commission's indication that it would then consider such a motion and stating that since October 29 the defense had been "working day and night," with "no time whatsoever to prepare any affirmative defense," since counsel had been fully occupied trying "to keep up with that new Bill of Particulars."

The commission thereupon retired for deliberation and, on resuming its sessions shortly, denied the motion. Counsel then asked for "a short recess of a day." The commission suggested a recess until 1:30 in the afternoon. Counsel responded this would not suffice. The commission stated it felt "that the Defense should be prepared at least on its opening statement," to which senior counsel answered: "We haven't had time to do that, sir." The commission then recessed until 8:30 the following morning.

Further comment is hardly required. Obviously the burden placed upon the defense, in the short time allowed for preparation on the original bill, was not only "tremendous." In view of all the facts, it was an impossible one, even though the time allowed was a week longer than asked. But the grosser vice was later when the burden was more than doubled by service of the supplemental bill on the eve of trial, a procedure which, taken in connection with the consistent denials of continuance and the commission's later reversal of its rulings favorable to the defense,

---

[27] The commission went on to question the need for all of the six officers representing the defense to be present during presentation of all the case, suggested one or two would be adequate and others "should be out of the courtroom" engaged in other matters and strongly suggested bringing in additional counsel in the midst of the trial, all to the end that "need to request a continuance may not arise."

was wholly arbitrary, cutting off the last vestige of adequate chance to prepare defense and imposing a burden the most able counsel could not bear. This sort of thing has no place in our system of justice, civil or military. Without more, this wide departure from the most elementary principles of fairness vitiated the proceeding. When added to the other denials of fundamental right sketched above, it deprived the proceeding of any semblance of trial as we know that institution.

## IV.

### *Applicability of the Articles of War.*

The Court's opinion puts the proceeding and the petitioner, in so far as any rights relating to his trial and conviction are concerned, wholly outside the Articles of War. In view of what has taken place, I think the decision's necessary effect is also to place them entirely beyond limitation and protection, respectively, by the Constitution. I disagree as to both conclusions or effects.

The Court rules that Congress has not made Articles 25 and 38 applicable to this proceeding. I think it has made them applicable to this and all other military commissions or tribunals. If so, the commission not only lost all power to punish petitioner by what occurred in the proceedings. It never acquired jurisdiction to try him. For the directive by which it was constituted, in the provisions of § 16,[28] was squarely in conflict with Articles 25 and 38 of the Articles of War [29] and therefore was void.

---

[28] See note 9.

[29] Article 25 is as follows: "A duly authenticated deposition taken upon reasonable notice to the opposite party may be read in evidence before *any military court or commission in any case not capital, or* in any proceeding before a *court of inquiry or a military board, if* such deposition be taken when the witness resides, is found, or is about to go beyond the State, Territory, or district in which the court, commission, or board is ordered to sit, or beyond the distance of one hundred miles

Article 25 allows reading of depositions in evidence, under prescribed conditions, in the plainest terms "before *any* military court or commission *in any case not capital,*" providing, however, that "testimony by deposition may be adduced *for the defense in capital cases.*" (Emphasis added.) This language clearly and broadly covers every kind of military tribunal, whether "court" or "commission." It covers all capital cases. It makes no exception or distinction for any accused.

Article 38 authorizes the President by regulations to prescribe procedure, including modes of proof, even more all-inclusively if possible, "in cases before courts-martial, courts of inquiry, military commissions, and other military tribunals." Language could not be more broadly inclusive. No exceptions are mentioned or suggested, whether of tribunals or of accused persons. Every kind of military body for performing the function of trial is covered. That is clear from the face of the Article.

Article 38 moreover limits the President's power. He is so far as practicable to prescribe "the rules of evidence generally recognized in the trial of criminal cases in the

from the place of trial or hearing, or when it appears to the satisfaction of the court, commission, board, or appointing authority that the witness, by reason of age, sickness, bodily infirmity, imprisonment, or other reasonable cause, is unable to appear and testify in person at the place of trial or hearing: *Provided, That testimony by deposition may be adduced for the defense in capital cases.*" (Emphasis added.) 10 U. S. C. § 1496.

Article 38 reads: "The President may, by regulations, which he may modify from time to time, prescribe the procedure, *including modes of proof,* in cases before *courts-martial, courts of inquiry, military commissions, and other military tribunals,* which regulations shall insofar as he shall deem practicable, apply the rules of evidence generally recognized in the trial of criminal cases in the district courts of the United States: *Provided, That nothing contrary to or inconsistent with these articles shall be so prescribed: Provided further, That all rules made in pursuance of this article shall be laid before the Congress annually.*" (Emphasis added.) 10 U. S. C. § 1509.

district courts of the United States," a clear mandate that Congress intended all military trials to conform as closely as possible to our customary procedural and evidentiary protections, constitutional and statutory, for accused persons. But there are also two unqualified limitations, one "that nothing contrary to or inconsistent with *these* articles [specifically here Article 25] shall be so prescribed"; the other "that all rules made in pursuance of this article shall be laid before the Congress annually."

Notwithstanding these broad terms the Court, resting chiefly on Article 2, concludes the petitioner was not among the persons there declared to be subject to the Articles of War and therefore the commission which tries him is not subject to them. That Article does not cover prisoners of war or war criminals. Neither does it cover civilians in occupied territories, theatres of military operations or other places under military jurisdiction within or without the United States or territory subject to its sovereignty, whether they be neutrals or enemy aliens, even citizens of the United States, unless they are connected in the manner Article 2 prescribes with our armed forces, exclusive of the Navy.

The logic which excludes petitioner on the basis that prisoners of war are not mentioned in Article 2 would exclude all these. I strongly doubt the Court would go so far, if presented with a trial like this in such instances. Nor does it follow necessarily that, because some persons may not be mentioned in Article 2, they can be tried without regard to any of the limitations placed by any of the other Articles upon military tribunals.

Article 2 in defining persons "subject to the articles of war" was, I think, specifying those to whom the Articles in general were applicable. And there is no dispute that most of the Articles are not applicable to the petitioner. It does not follow, however, and Article 2 does not provide, that there may not be in the Articles specific provisions

covering persons other than those specified in Article 2. Had it so provided, Article 2 would have been contradictory not only of Articles 25 and 38 but also of Article 15 among others.

In 1916, when the last general revision of the Articles of War took place,[30] for the first time certain of the Articles were specifically made applicable to military commissions. Until then they had applied only to courts-martial. There were two purposes, the first to give statutory recognition to the military commission without loss of prior jurisdiction and the second to give those tried before military commissions some of the more important protections afforded persons tried by courts-martial.

In order to effectuate the first purpose, the Army proposed Article 15.[31] To effectuate the second purpose, Arti-

---

[30] Another revision of the Articles of War took place in 1920. At this time Article 15 was slightly amended.

In 1916 Article 15 was enacted to read: "The provisions of these articles conferring jurisdiction upon courts-martial shall not be construed as depriving military commissions, provost courts, or other military tribunals *of concurrent jurisdiction* in respect of offenders or offenses that by the law of war may be lawfully triable by such military commissions, provost courts, or other military tribunals." (Emphasis added.)

The 1920 amendment put in the words "by statute or" before the words "by the law of war" and omitted the word "lawfully."

[31] Speaking at the Hearings before the Committee on Military Affairs, House of Representatives, 62d Cong., 2d Sess., printed as an Appendix to S. Rep. 229, 63d Cong., 2d Sess., General Crowder said:

"The next article, No. 15, is entirely new, and the reasons for its insertion in the code are these: In our War with Mexico two war courts were brought into existence by orders of Gen. Scott, viz, the military commission and the council of war. By the military commission Gen. Scott tried cases cognizable in time of peace by civil courts, and by the council of war he tried offenses against the laws of war. *The council of war did not survive the Mexican War period, and in our subsequent wars its jurisdiction has been taken over by the military commission,* which during the Civil War period tried more than 2,000 cases. While the military commission has not been formally authorized by statute, its jurisdiction as a war court has been upheld by the Supreme

Court of the United States. It is an institution of the greatest importance in a period of war and should be preserved. In the new code *the jurisdiction of courts-martial has been somewhat amplified by the introduction of the phrase 'Persons subject to military law.'* There will be more instances in the future than in the past when the jurisdiction of courts-martial will overlap that of the war courts, and the question would arise whether Congress having vested jurisdiction by statute the common law of war *jurisdiction* was not ousted. I wish to make it *perfectly plain by the new article that in such cases the jurisdiction of the war court is concurrent.*" S. Rep. No. 229, 63d Cong., 2d Sess., p. 53. (Emphasis added.)

And later, in 1916, speaking before the Subcommittee on Military Affairs of the Senate at their Hearings on S. 3191, a project for the revision of the Articles of War, 64th Cong., 1st Sess., printed as an Appendix to S. Rep. 130, 64th Cong., 1st Sess., General Crowder explained at greater length:

"Article 15 is new. We have included in article 2 as subject to military law a number of persons who are also subject to trial by military commission. A military commission is our common-law war court. It has no statutory existence, though it is recognized by statute law. As long as the articles embraced them in the designation 'persons subject to military law,' and provided that they might be tried by court-martial, *I was afraid that, having made a special provision for their trial by court-martial, it might be held that the provision operated to exclude trials by military commission and other war courts; so this new article was introduced* . . .

"*It just saves to these war courts the jurisdiction they now have and makes it a concurrent jurisdiction with courts-martial, so that the military commander in the field* in time of war *will be at liberty to employ either form of court* that happens to be convenient. *Both classes of courts have the same procedure.* For the information of the committee and in explanation of these war courts to which I have referred I insert here an explanation from Winthrop's Military Law and Precedents—

" 'The military commission—a war court—had its origin in G. O. 20, Headquarters of the Army at Tampico, February 19, 1847 (Gen. Scott). Its jurisdiction was confined mainly to criminal offenses of the class cognizable by civil courts in time of peace committed by inhabitants of the theater of hostilities. A further war court was originated by Gen. Scott at the same time, called "council of war," with jurisdiction to try the same classes of persons for violations of the laws of war, mainly guerrillas. These two jurisdictions were united in the later war court of the Civil War and Spanish War periods, for which the general designation of "military commission" was retained. The military commission was given statutory recognition in section 30, act of

cles 25 and 38 and several others were proposed.[32]  But as the Court now construes the Articles of War, they have no application to military commissions before which alleged offenders against the laws of war are tried.  What the Court holds in effect is that there are two types of military commission, one to try offenses which might be cognizable by a court-martial, the other to try war crimes, and that Congress intended the Articles of War referring in terms to military commissions without exception to be applicable only to the first type.

March 3, 1863, and in various other statutes of that period.  The United States Supreme Court has acknowledged the validity of its judgments (Ex parte Vallandigham, 1 Wall., 243, and Coleman v. Tennessee, 97 U. S., 509).  It tried more than 2,000 cases during the Civil War and reconstruction period.  *Its composition, constitution, and procedure follows the analogy of courts-martial.* Another war court is the provost court, an inferior court with jurisdiction assimilated to that of justices of the peace and police courts; and other war courts variously designated "courts of conciliation," "arbitrators," "military tribunals," have been convened by military commanders in the exercise of the war power as occasion and necessity dictated.'

"Yet, as I have said, these war courts never have been formally authorized by statute.

"Senator COLT.  They grew out of usage and necessity?

"Gen. CROWDER.  Out of usage and necessity.  I thought it was just as well, as inquiries would arise, to put this information in the record."  S. Rep. No. 130, 64th Cong., 1st Sess. (1916) p. 40. (Emphasis added.)

Article 15 was also explained in the "Report of a committee on the proposed revision of the articles of war, pursuant to instructions of the Chief of Staff, March 10, 1915," included in Revision of the Articles of War, Comparative Prints, etc., 1904–1920, J. A. G. O., as follows:

"A number of articles . . . of the revision have the effect of giving courts-martial jurisdiction over certain offenders and offenses which, under the law of war or by statute, are also triable by military commissions, provost courts, etc.  Article 15 is introduced for the purpose of making clear that in such cases a court-martial has only a concurrent jurisdiction with such war tribunals."

[32] Of course, Articles 25 and 38, at the same time that they gave protection to defendants before military commissions, also provided for the application by such tribunals of modern rules of procedure and evidence.

This misconceives both the history of military commissions and the legislative history of the Articles of War. There is only one kind of military commission. It is true, as the history noted shows, that what is now called "the military commission" arose from two separate military courts instituted during the Mexican War. The first military court, called by General Scott a "military commission," was given jurisdiction in Mexico over criminal offenses of the class cognizable by civil courts in time of peace. The other military court, called a "council of war," was given jurisdiction over offenses against the laws of war. Winthrop, Military Law and Precedents (2d ed., reprinted 1920) *1298–1299. During the Civil War "the two jurisdictions of the earlier commission and council respectively . . . [were] *united* in the . . . war-court, for which the general designation of 'military commission' was retained as the preferable one." Winthrop, *supra*, at *1299. Since that time there has been only one type of military tribunal called the military commission, though it may exercise different kinds of jurisdiction,[33] according to the circumstances under which and purposes for which it is convened.

The testimony of General Crowder is perhaps the most authoritative evidence of what was intended by the legis-

---

[33] Winthrop, speaking of military commissions at the time he was writing, 1896, says: "The offences cognizable by military commissions may thus be classed as follows: (1) Crimes and statutory offences cognizable by State or U. S. courts, and which would properly be tried by such courts if open and acting; (2) *Violations of the laws and usages of war* cognizable by military tribunals only; (3) Breaches of military orders or regulations for which offenders are not legally triable by court-martial under the Articles of war." (Emphasis added.) Winthrop, at *1309. And cf. Fairman, The Law of Martial Rule (2d ed. 1943): "Military commissions take cognizance of three categories of criminal cases: *offenses against the laws of war*, breaches of military regulations, and civil crimes which, where the ordinary courts have ceased to function, cannot be tried normally." (Emphasis added.) Fairman, 265–266. See also Davis, A Treatise on the Military Law of the United States (1915) 309–310.

lation, for he was its most active official sponsor, spending years in securing its adoption and revision. Articles 15, 25 and 38 particularly are traceable to his efforts. His concern to secure statutory recognition for military commissions was equalled by his concern that the statutory provisions giving this should not restrict their preexisting jurisdiction. He did not wish by securing additional jurisdiction, overlapping partially that of the court-martial, to surrender other. Hence Article 15. That Article had one purpose and one only. It was to make sure that the acquisition of partially concurrent jurisdiction with courts-martial should not cause loss of any other. And it was jurisdiction, not procedure, which was covered by other Articles, with which he and Congress were concerned in that Article. It discloses no purpose to deal in any way with procedure or to qualify Articles 25 and 38. And it is clear that General Crowder at all times regarded all military commissions as being governed by the identical procedure. In fact, so far as Articles 25 and 38 are concerned, this seems obvious for all types of military tribunals. The same would appear to be true of other Articles also, e. g., 24 (prohibiting compulsory self-incrimination), 26, 27, 32 (contempts), all except the last dealing with procedural matters.

Article 12 is especially significant. It empowers general courts-martial to try two classes of offenders: (1) "any person *subject to military law*," under the definition of Article 2, for any offense "made punishable by these articles"; (2) "and any other person who *by the law of war* is subject to trial *by military tribunals*," not covered by the terms of Article 2. (Emphasis added.)

Article 12 thus, in conformity with Article 15, gives the general court-martial concurrent jurisdiction of war crimes and war criminals with military commissions. Neither it nor any other Article states or indicates there are to be *two* kinds of general courts-martial for trying war crimes; yet

this is the necessary result of the Court's decision, unless in the alternative that would be to imply that in exercising such jurisdiction there is only one kind of general court-martial, but there are two or more kinds of military commission, with wholly different procedures and with the result that "the commander in the field" will not be free to determine whether general court-martial or military commission shall be used as the circumstances may dictate, but must govern his choice by the kind of procedure he wishes to have employed.

The only reasonable and, I think, possible conclusion to draw from the Articles is that the Articles which are in terms applicable to military commissions are so uniformly and those applicable to both such commissions and to courts-martial when exercising jurisdiction over offenders against the laws of war likewise are uniformly applicable, and not diversely according to the person or offense being tried.

Not only the face of the Articles, but specific statements in General Crowder's testimony support this view. Thus in the portion quoted above [34] from his 1916 statement, after stating expressly the purpose of Article 15 to preserve unimpaired the military commission's jurisdiction, and to make it concurrent with that of courts-martial in so far as the two would overlap, "so that the *military commander in the field* in time of war will be at liberty to employ either form of court that happens to be convenient," he went on to say: "Both classes of courts have the same procedure," a statement so unequivocal as to leave no room for question. And his quotation from Winthrop supports his statement, namely: "Its [i. e., the military commission's] composition, constitution and procedure follow the analogy of courts-martial."

At no point in the testimony is there suggestion that there are two types of military commission, one bound by

---

[34] Note 31.

the procedural provisions of the Articles, the other wholly free from their restraints or, as the Court strangely puts the matter, that there is only one kind of commission, but that it is bound or not bound by the Articles applicable in terms, depending upon who is being tried and for what offense; for that very difference makes the difference between one and two. The history and the discussion show conclusively that General Crowder wished to secure and Congress intended to give statutory recognition to all forms of military tribunals; to enable commanding officers in the field to use either court-martial or military commission as convenience might dictate, thus broadening to this extent the latter's jurisdiction and utility; but at the same time to preserve its full preexisting jurisdiction; and also to lay down identical provisions for governing or providing for the government of the procedure and rules of evidence of every type of military tribunal, wherever and however constituted.[35]

---

[35] In addition to the statements of General Crowder with relation to Article 15, set out in note 31 *supra*, see the following statements made with reference to Article 25, in 1912 at a hearing before the Committee on Military Affairs of the House: "We come now to article 25, which relates to the admissibility of depositions. . . . It will be noted further that *the application of the old article has been broadened to include military commissions, courts of inquiry, and military boards.*

"Mr. SWEET. Please explain what you mean by military commission.

"Gen. CROWDER. That is our common law of war court, and was referred to by me in a prior hearing. [The reference is to the discussion of Article 15.] This war court came into existence during the Mexican War, and was created by orders of Gen. Scott. It had jurisdiction to try all cases usually cognizable in time of peace by civil courts. Gen. Scott created another war court, called the 'council of war,' with jurisdiction to try offenses against the laws of war. The constitution, composition, and jurisdiction of these courts *have never been regulated by statute.* The council of war did not survive the Mexican War period, since which its jurisdiction has been taken over by the military commission. The military commission received express recognition in the reconstruction acts, and its *jurisdiction* has been affirmed and supported by all our courts. It was extensively employed during the

Finally, unless Congress was legislating with regard to all military commissions, Article 38, which gives the President the power to "prescribe the procedure, including modes of proof, in cases before courts-martial, courts of inquiry, military commissions, and other military tribunals," takes on a rather senseless meaning; for the President would have such power only with respect to those military commissions exercising concurrent jurisdiction with courts-martial.

All this seems so obvious, upon a mere reading of the Articles themselves and the legislative history, as not to require demonstration. And all this Congress knew, as that history shows. In the face of that showing I cannot accept the Court's highly strained construction, first, because I think it is in plain contradiction of the facts disclosed by the history of Articles 15, 25 and 38 as well as their language; and also because that construction defeats at least two of the ends General Crowder had in mind, namely, to secure statutory recognition for every form of military tribunal and to provide for them a basic uni-

Civil War period and also during the Spanish-American War. It is highly desirable that this important war court should be continued to be governed as heretofore, by the laws of war rather than by statute." S. Rep. No. 229, 63d Cong., 2d Sess., 59; cf. S. Rep. 130, 64th Cong., 1st Sess., 54-55. (Emphasis added.) See also Hearings before the Subcommittee of the Committee on Military Affairs of the Senate on Establishment of Military Justice, 66th Cong., 1st Sess., 1182-1183.

Further evidence that procedural provisions of the Articles were intended to apply to all forms of military tribunal is given by Article 24, 10 U. S. C. § 1495, which provides against compulsory self-incrimination "before a military court, commission, court of inquiry, or board, or before an officer conducting an investigation." This article was drafted so that "The prohibition should reach all witnesses, *irrespective of the class of military tribunal* before which they appear . . ." (Emphasis added.) Comparative Print showing S. 3191 with the Present Articles of War and other Related Statutes, and Explanatory Notes, Printed for use of the Senate Committee on Military Affairs, 64th Cong., 1st Sess., 17, included in Revision of the Articles of War, Comparative Prints, Etc., 1904-1920, J. A. G. O.

form mode of procedure or method of providing for their procedure.

·Accordingly, I think Articles 25 and 38 are applicable to this proceeding; that the provisions of the governing directive in § 16 are in direct conflict with those Articles; and for that reason the commission was invalidly constituted, was without jurisdiction, and its sentence is therefore void.

## V.

### *The Geneva Convention of 1929.*

If the provisions of Articles 25 and 38 were not applicable to the proceeding by their own force as Acts of Congress, I think they would still be made applicable by virtue of the terms of the Geneva Convention of 1929, in particular Article 63. And in other respects, in my opinion, the petitioner's trial was not in accord with that treaty, namely, with Article 60.

The Court does not hold that the Geneva Convention is not binding upon the United States and no such contention has been made in this case.[36] It relies on other

---

[36] We are informed that Japan has not ratified the Geneva Convention. See discussion of Article 82 in the paragraphs below. We are also informed, however—and the record shows this at least as to Japan—that at the beginning of the war both the United States and Japan announced their intention to adhere to the provisions of that treaty. The force of that understanding continues, perhaps with greater reason if not effect, despite the end of hostilities. See note 40 and text.

Article 82 provides:

"The provisions of the present Convention must be respected by the High Contracting Parties under all circumstances.

"In case, in time of war, one of the belligerents is not a party to the Convention, its provisions shall nevertheless remain in force as between the belligerents who are parties thereto."

It is not clear whether the Article means that during a war, when one of the belligerents is not a party to the Convention, the provisions must nevertheless be applied by all the other belligerents to the prisoners of war not only of one another but also of the power that was

arguments to show that Article 60, which provides that the protecting power shall be notified in advance of a judicial proceeding directed against a prisoner of war, and Article 63, which provides that a prisoner of war may be tried only by the same courts and according to the same procedure as in the case of persons belonging to the armed forces of the detaining power, are not properly invoked by the petitioner. Before considering the Court's view that these Articles are not applicable to this proceeding by their terms, it may be noted that on his surrender petitioner was interned in conformity with Article 9 of this Convention.

not a party thereto or whether it means that they need not be applied to soldiers of the nonparticipating party who have been captured. If the latter meaning is accepted, the first paragraph would seem to contradict the second.

"Legislative history" here is of some, if little, aid. A suggested draft of a convention on war prisoners drawn up in advance of the Geneva meeting by the International Committee of the Red Cross (Actes de la Conférence Diplomatique de Genève, edited by Des Gouttes, pp. 21–34) provided in Article 92 that the provisions of the Convention "ne cesseront d'être obligatories qu'au cas où l'un des Etats belligérents participant à la Convention se trouve avoir à combattre les forces armées d'un autre Etat que n'y serait par partie et à l'égard de cet Etat seulement." See Rasmussen, Code des Prisonniers de Guerre (1931) 70. The fact that this suggested article was not included in the Geneva Convention would indicate that the nations in attendance were avoiding a decision on this problem. But I think it shows more, that is, it manifests an intention not to foreclose a future holding that under the terms of the Convention a state is bound to apply the provisions to prisoners of war of nonparticipating states. And not to foreclose such a holding is to invite one. We should, in my opinion, so hold, for reasons of security to members of our own armed forces taken prisoner, if for no others.

Moreover, if this view is wrong and the Geneva Convention is not strictly binding upon the United States as a treaty, it is strong evidence of and should be held binding as representing what have become the civilized rules of international warfare. Yamashita is as much entitled to the benefit of such rules as to the benefit of a binding treaty which codifies them. See U. S. War Dept., Basic Field Manual, Rules of Land Warfare (1940), par. 5–*b*.

**74**

The chief argument is that Articles 60 and 63 have reference only to offenses committed by a prisoner of war while a prisoner of war and not to violations of the laws of war committed while a combatant. This conclusion is derived from the setting in which these Articles are placed. I do not agree that the context gives any support to this argument. The argument is in essence of the same type as the argument the Court employs to nullify the application of Articles 25 and 38 of the Articles of War by restricting their own broader coverage by reference to Article 2. For reasons set forth in the margin,[37] I think it equally invalid here.

[37] Title III of the Convention, which comprises Articles 7 to 67, is called "Captivity." It contains § I, "Evacuation of Prisoners of War" (Articles 7–8); § II, "Prisoners-of-War Camps" (Articles 9–26); § III, "Labor of Prisoners of War" (Articles 27–34); § IV, "External Relations of Prisoners of War" (Articles 35–41); and § V, "Prisoners' Relations with the Authorities" (Articles 42–67). Thus Title III regulates all the various incidents of a prisoner of war's life while in captivity.

Section V, with which we are immediately concerned, is divided into three chapters. Chapter 1 (Article 42) gives a prisoner of war the right to complain of his condition of captivity. Chapter 2 (Articles 43–44) gives prisoners of war the right to appoint agents to represent them. Chapter 3 is divided into three subsections and is termed "Penalties Applicable to Prisoners of War." Subsection 1 (Articles 45–53) contains various miscellaneous articles to be considered in detail later. Subsection 2 (Articles 54–59) contains provisions with respect to disciplinary punishments. And subsection 3 (Articles 60–67), which is termed "Judicial Suits," contains various provisions for protection of a prisoner's rights in judicial proceedings instituted against him.

Thus, subsection 3, which contains Articles 60 and 63, as opposed to subsection 2, of Chapter 3, is concerned not with mere problems of discipline, as is the latter, but with the more serious matters of trial leading to imprisonment or possible sentence of death; cf. Brereton, The Administration of Justice Among Prisoners of War by Military Courts (1935) 1 Proc. Australian & New Zealand Society of International Law 143, 153. The Court, however, would have the distinction

between subsection 2 and subsection 3 one between minor disciplinary action against a prisoner of war for acts committed while a prisoner and major judicial action against a prisoner of war for acts committed while a prisoner. This narrow view not only is highly strained, confusing the different situations and problems treated by the two subdivisions. It defeats the most important protection subsection 3 was intended to secure, for our own as well as for enemy captive military personnel.

At the most, there would be logic in the Court's construction if it could be said that all of Chapter 3 deals with acts committed while a prisoner of war. Of course, subsection 2 does, because of the very nature of its subject-matter. Disciplinary action will be taken by a captor power against prisoners of war only for acts committed by prisoners after capture.

But it is said that subsection 1 deals exclusively with acts committed by a prisoner of war after having become a prisoner, and this indicates subsection 3 is limited similarly. This ignores the fact that some of the articles in subsection 1 appear, on their face, to apply to all judicial proceedings for whatever purpose instituted. Article 46, for example, provides in part:

> "Punishments other than those provided for the same acts for soldiers of the national armies may not be imposed upon prisoners of war by the military authorities and courts of the detaining Power."

This seems to refer to war crimes as well as to other offenses; for surely a country cannot punish soldiers of another army for offenses against the laws of war, when it would not punish its own soldiers for the same offenses. Similarly, Article 47 in subsection 1 appears to refer to war crimes as well as to crimes committed by a prisoner after his capture. It reads in part:

> "Judicial proceedings against prisoners of war shall be conducted as rapidly as the circumstances permit; preventive imprisonment shall be limited as much as possible."

Thus, at the most, subsection 1 contains, in some of its articles, the same ambiguities and is open to the same problem that we are faced with in construing Articles 60 and 63. It cannot be said, therefore, that all of Chapter 3, and especially subsection 3, relate only to acts committed by prisoners of war after capture, for the meaning of subsection 3, in this argument, is related to the meaning of subsection 1; and subsection 1 is no more clearly restricted to punishments and proceedings in disciplinary matters than is subsection 3.

Neither Article 60 nor Article 63 contains such a restriction of meaning as the Court reads into them.[38]   In the absence of any such limitation, it would seem that they were intended to cover all judicial proceedings, whether instituted for crimes allegedly committed before capture or later.   Policy supports this view.   For such a construction is required for the security of our own soldiers, taken prisoner, as much as for that of prisoners we take.   And the opposite one leaves prisoners of war open to any form of trial and punishment for offenses against the laws of war their captors may wish to use, while safeguarding them, to the extent of the treaty limitations, in cases of disciplinary offense.   This, in many instances, would be to make the treaty strain at a gnat and swallow the camel.

The United States has complied with neither of these Articles.   It did not notify the protecting power of Japan in advance of trial as Article 60 requires it to do, although the supplemental bill charges the same failure to peti-

---

. [38] Article 60 pertinently is as follows: "At the opening of a judicial proceeding directed against a prisoner of war, the detaining Power shall advise the representative of the protecting Power thereof as soon as possible, and always before the date set for the opening of the trial.

"This advice shall contain the following information:

"a) Civil state and rank of prisoner;

"b) Place of sojourn or imprisonment;

"c) Specification of the [count] or counts of the indictment, giving the legal provisions applicable.

"If it is not possible to mention in that advice the court which will pass upon the matter, the date of opening the trial and the place where it will take place, this information must be furnished to the representative of the protecting Power later, as soon as possible, and at all events, at least three weeks before the opening of the trial."

Article 63 reads: "Sentence may be pronounced against a prisoner of war only by the same courts and according to the same procedure as in the case of persons belonging to the armed forces of the detaining Power."

tioner in Item 89.[39]   It is said that, although this may be true, the proceeding is not thereby invalidated.   The argument is that our noncompliance merely gives Japan a right of indemnity against us and that Article 60 was not intended to give Yamashita any personal rights.   I cannot agree.   The treaties made by the United States are by the Constitution made the supreme law of the land.   In the absence of something in the treaty indicating that its provisions were not intended to be enforced, upon breach, by more than subsequent indemnification, it is, as I conceive it, the duty of the courts of this country to insure the nation's compliance with such treaties, except in the case of political questions.   This is especially true where the treaty has provisions—such as Article 60—for the protection of a man being tried for an offense the punishment for which is death; for to say that it was intended to provide for enforcement of such provisions solely by claim, after breach, of indemnity would be in many instances, especially those involving trial of nationals of a defeated nation by a conquering one, to deprive the Articles of all force.   Executed men are not much aided by postwar claims for indemnity.   I do not think the adhering powers' purpose was to provide only for such ineffective relief.

Finally, the Government has argued that Article 60 has no application after the actual cessation of hostilities, as there is no longer any need for an intervening power between the two belligerents.   The premise is that Japan no longer needs Switzerland to intervene with the United

---

[39] Item 89 charged the armed forces of Japan with subjecting to trial certain named and other prisoners of war "without prior notice to a representative of the protecting power, without opportunity to defend, and without counsel; denying opportunity to appeal from the sentence rendered; failing to notify the protecting power of the sentence pronounced; and executing a death sentence without communicating to the representative of the protecting power the nature and circumstances of the offense charged."

States to protect the rights of Japanese nationals, since Japan is now in direct communication with this Government. This of course is in contradiction of the Government's theory, in other connections, that the war is not over and military necessity still requires use of all the power necessary for actual combat.

Furthermore the premise overlooks all the realities of the situation. Japan is a defeated power, having surrendered, if not unconditionally then under the most severe conditions. Her territory is occupied by American military forces. She is scarcely in a position to bargain with us or to assert her rights. Nor can her nationals. She no longer holds American prisoners of war.[40] Certainly, if there was the need of an independent neutral to protect her nationals during the war, there is more now. In my opinion the failure to give the notice required by Article 60 is only another instance of the commission's failure to observe the obligations of our law.

What is more important, there was no compliance with Article 63 of the same Convention. Yamashita was not tried "according to the same procedure as in the case of persons belonging to the armed forces of the detaining Power." Had one of our soldiers or officers been tried for alleged war crimes, he would have been entitled to the benefits of the Articles of War. I think that Yamashita was equally entitled to the same protection. In any event, he was entitled to their benefits under the provisions of Article 63 of the Geneva Convention. Those benefits he did not receive. Accordingly, his trial was in violation of the Convention.

## VI.

### The Fifth Amendment.

Wholly apart from the violation of the Articles of War and of the Geneva Convention, I am completely unable to

---

[40] Nations adhere to international treaties regulating the conduct of war at least in part because of the fear of retaliation. Japan no longer has the means of retaliating.

accept or to understand the Court's ruling concerning the applicability of the due process clause of the Fifth Amendment to this case. Not heretofore has it been held that any human being is beyond its universally protecting spread in the guaranty of a fair trial in the most fundamental sense. That door is dangerous to open. I will have no part in opening it. For once it is ajar, even for enemy belligerents, it can be pushed back wider for others, perhaps ultimately for all.

The Court does not declare expressly that petitioner as an enemy belligerent has no constitutional rights, a ruling I could understand but not accept. Neither does it affirm that he has some, if but little, constitutional protection. Nor does the Court defend what was done. I think the effect of what it does is in substance to deny him all such safeguards. And this is the great issue in the cause.

For it is exactly here we enter wholly untrodden ground. The safe signposts to the rear are not in the sum of protections surrounding jury trials or any other proceeding known to our law. Nor is the essence of the Fifth Amendment's elementary protection comprehended in any single one of our time-honored specific constitutional safeguards in trial, though there are some without which the words "fair trial" and all they connote become a mockery.

Apart from a tribunal concerned that the law as applied shall be an instrument of justice, albeit stern in measure to the guilt established, the heart of the security lies in two things. One is that conviction shall not rest in any essential part upon unchecked rumor, report, or the results of the prosecution's ex parte investigations, but shall stand on proven fact; the other, correlative, lies in a fair chance to defend. This embraces at the least the rights to know with reasonable clarity in advance of the trial the exact nature of the offense with which one is to be charged; to have reasonable time for preparing to meet the charge and to have the aid of counsel in doing so, as also in the

trial itself; and if, during its course, one is taken by sur-
prise, through the injection of new charges or reversal of
rulings which brings forth new masses of evidence, then
to have further reasonable time for meeting the unex-
pected shift.

So far as I know, it has not yet been held that any tri-
bunal in our system, of whatever character, is free to re-
ceive such evidence "as *in its opinion* would be *of assistance*
in proving or disproving the charge," or, again as in its
opinion, "would have probative value in the mind of a
reasonable man"; and, having received what in its un-
limited discretion it regards as sufficient, is also free to de-
termine what weight may be given to the evidence received
without restraint.[41]

When to this fatal defect in the directive, however in-
nocently made, are added the broad departures from the
fundamentals of fair play in the proof and in the right to
defend which occurred throughout the proceeding, there
can be no accommodation with the due process of law
which the Fifth Amendment demands.

All this the Court puts to one side with the short as-
sertion that no question of due process under the Fifth
Amendment or jurisdiction reviewable here is presented.
I do not think this meets the issue, standing alone or in
conjunction with the suggestion which follows that the
Court gives no intimation one way or the other concerning

---

[41] There can be no limit either to the admissibility or the use of
evidence if the only test to be applied concerns probative value and
the only test of probative value, as the directive commanded and the
commission followed out, lies "in the Commission's opinion," whether
that be concerning the assistance the "evidence" tendered would give
in proving or disproving the charge or as it might think would "have
value in the mind of a reasonable man." Nor is it enough to establish
the semblance of a constitutional right that the commission declares,
in receiving the evidence, that it comes in as having only such probative
value, if any, as the commission decides to award it and this is accepted
as conclusive.

what Fifth Amendment due process might require in other situations.

It may be appropriate to add here that, although without doubt the directive was drawn in good faith in the belief that it would expedite the trial and that enemy belligerents in petitioner's position were not entitled to more, that state of mind and purpose cannot cure the nullification of basic constitutional standards which has taken place.

It is not necessary to recapitulate. The difference between the Court's view of this proceeding and my own comes down in the end to the view, on the one hand, that there is no law restrictive upon these proceedings other than whatever rules and regulations may be prescribed for their government by the executive authority or the military and, on the other hand, that the provisions of the Articles of War, of the Geneva Convention and the Fifth Amendment apply.

I cannot accept the view that anywhere in our system resides or lurks a power so unrestrained to deal with any human being through any process of trial. What military agencies or authorities may do with our enemies in battle or invasion, apart from proceedings in the nature of trial and some semblance of judicial action, is beside the point. Nor has any human being heretofore been held to be wholly beyond elementary procedural protection by the Fifth Amendment. I cannot consent to even implied departure from that great absolute.

It was a great patriot who said:

> "He that would make his own liberty secure must guard even his enemy from oppression; for if he violates this duty he establishes a precedent that will reach to himself."[42]

MR. JUSTICE MURPHY joins in this opinion.

---

[42] 2 The Complete Writings of Thomas Paine (edited by Foner, 1945) 588.